## CHARLEY ALCORN v. STATE.

No. A-9759.   Oct. 23, 1940.
(106 P. 2d 838.)

Ernest R. Brown, of Pryor, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, P. J. Plaintiff in error, Charley Alcorn, herein referred to as defendant, was convicted in the district court of Mayes county of the crime of rape in the second degree. The punishment assessed being imprisonment in the State Penitentiary at McAlester for term of one year. Motion for new trial was denied and exception saved.

Judgment was rendered April 26, 1939. The record shows the defendant's application, as a poor person to be furnished with a transcript of the testimony taken on the trial, was by order of the court granted.

It appears the preliminary trial was had October 28th, and defendant was held to answer to the district court for the crime of rape in the first degree, as defined by section 2515, St. 1931, 3rd sub. 21, Okla. St. Ann. § 1111, subd. 3.

To reverse the judgment, defendant appealed by filing in this court October 18, 1939, petition in error with case-made.

The information as amended, after the jury was impaneled, charges that in said county on or about the 15th of October, 1939, defendant, Charley Alcorn, accomplished an act of sexual intercourse with one Ruby McClain, a

female of the age of 15 years, and not the wife of said defendant.

No briefs have been filed and no errors have been pointed out except as shown by defendant's motion for a new trial, and by the petition in error.

This court has repeatedly laid down the rule that when no counsel appears and no briefs are filed, the court will not diligently search the record to discover errors, but will look to the jurisdiction of the court and the sufficiency of the evidence to support the conviction.

It appears that defendant was 42 years old at the time the crime is alleged to have been committed, was a widower, and father of three boys.

Ruby McClain testified that she had known the defendant over a year and saw him on the night of October 15, 1938, a little way west of Rose; another girl was with her; that he asked them to go with him to a dance hall some place, and they agreed to; then they went on to Rose and met two boys, Lloyd Wyatt and Jesse Bates, and talked to them a few minutes and she got in the car with Wyatt and the Bates boy. Arco Jenkins and Della Hanna were in the car and they all decided to meet each other at the Silver Moon at 8 o'clock; that she changed her mind to go with them and told Lloyd to tell Charley they would meet him west of Rose; they met Charley there and she got out of their car and got in the car with him and went on to Pryor and stopped first at the Silver Moon, south of Pryor; that it is a little "Honky-Tonk" house where they dance and sell drinks. She got out of the car and went in the Silver Moon to see if there was any one there she recognized; she asked a boy by the name of Curley if he had seen Gwendolyn Potts and Margie Cox. Then went back to the car and came up town to the Sunshine Cafe, on Main street; they went in, he drank a beer,

and she drank a coke, went out to the car and drove east and passed Gwendolyn Potts and Margie Cox, stopped and talked with them 10 or 15 minutes by the schoolhouse in Pryor, and then went south and stopped at Dugan Smith's place; there Charley got out of the car and had a conversation with Dugan Smith in front of the filling station; they then went on south to Red Heart Inn, and fell in company with Opal Wainwright, Bill Thomas, and Pete Garner, and they all danced and drank whisky; that she left the Red Heart Inn in company with Charley Alcorn, Pete Garner, Bill Thomas, and Opal Wainwright and another boy, in Pete Garner's car and stopped at a house. One of the men went in and got some more whisky, and they drove back to the Red Heart Inn, danced some more and stayed there until about 4 o'clock in the morning. She left with Charley in his car, and they went north into Choteau, and turned east until they got to Dugan Smith's Tourist Camp; there they got out and went in a cabin, removed their clothes, got on the bed and Charley Alcorn had sexual intercourse with her; that she had been back to see that cabin since; that there was no conversation before the act, but after the act she told him she did not come there with him to be treated that way; that they put on their clothes, got in the car and drove east to Locust Grove and stopped a quarter of a mile from her grandfather, Oscar McClain's, house; she got out of the car and went up to the house; they got up and her step-grandmother cooked breakfast; after eating breakfast her mother and stepfather came there and she went with them to Mrs. Boyd's in Rose; she told her mother what had happened and they went to Dr. Herrington's office in Pryor and the doctor examined her.

On cross-examination she stated that her grandfather and his wife asked her where she had been and she told

them, but did not tell them anything about this offense; that she did not tell her grandmother there that Mark Hanna had been making improper advances towards her, and did not discuss a letter written to them by her. That she went with her mother and stepfather and her aunt and uncle to Bates' Store in Rose; that her stepfather called Charley Alcorn out of his garage and talked to him while she was there with them before they came on to Pryor.

That she first saw Mr. Wilkerson (special counsel representing the state) on Tuesday following October 15th.

Asked if she didn't have a conversation with Jesse Bates after she testified on the preliminary examination held here October 28th, and told Mr. Bates "that if your parents had not been present you would have testified differently?" Answered: "No, sir, I did not say it."

Handed instrument, Defendant's Exhibit 1, she was asked:

"Q. Is that in your handwriting Miss Ruby? A. Yes, sir. Q. Is that signed by you.? A. Yes, sir. Q. That letter was written by you and addressed to your grandmother? A. Yes, sir. Mr. Brown: The defendant now offers in evidence exhibit 1. Mr. Wilkerson: The state objects. The Court: Sustained."

Redirect:

"Q. Tell the court and jury whether or not that was the first experience you ever had along sexual lines—sexual intercourse? A. Yes, sir. Mr. Wilkerson: That is all, Miss Ruby."

Mrs. Mark Hanna testified that Ruby McClain is her daughter; that "on the night of October 15th we hunted her; we first went to Mr. Jenkins, then to Hosey's and came back to Rose, then we went to Pryor and got trace of

her from Gwendolyn Potts; we found her at Grandpa Mc-Clain's, she told us who she had been out with, we first took her to Mr. Bates' in Rose, then we came over here to Dr. Herrington's"; that there was blood on her undergarment.

On redirect she stated that Ruby had been making her home with her, working during the week and coming home on Saturday night and Sunday.

Lloyd Wyatt testified that he had known Charley Alcorn and Ruby McClain close to a year. On October 15th Ruby walked up to his car in Rose and got in. Jesse Bates and a girl that worked with Ruby, named Jenkins, were in the car; that he drove about 100 yards out of Rose and stopped. Ruby said she did not want to go on with us down to this girl's house. Alcorn came by and she asked him to stop; it was the understanding that they would go on, the Bates boy and his girl, with his girl would go on and meet her at Pryor and Ruby left his car and got in the car with Alcorn, and they went west, but they did not go to Pryor.

Jesse Bates testified that he lives at Rose Prairie, seven miles east of Locust Grove; was in the village of Rose the 15th of October, last year; knows Ruby McClain and Charley Alcorn; first saw Ruby McClain that night up by the schoolhouse; he was in a car with Lloyd Wyatt and another girl; that they drove just a short distance out of Rose and stopped and Ruby got out of the car when another car came up. She asked them to come to Pryor, and got in the other car; it went west.

On cross-examination he stated that on the day of the preliminary he talked with Ruby McClain in this courtroom about her testimony, and she said she would have changed her testimony if her parents had not been there.

Gwendolyn Potts testified that she lives south of Pryor, had known Ruby McClain about four years; that October 15th last year, she saw her by the schoolhouse in Pryor; Margie Cox and two boys were with her. Ruby was in a car and said the man with her was Charley Alcorn.

Opal Wainwright testified that she knows Ruby McClain and Charley Alcorn and saw them together at the Red Heart Inn, on Highway 69, on the night of October 15th, but could not say when they left; that Bill Thomas, Pete Garner and the boy from Locust were there that night.

Dr. V. D. Herrington testified that he had an occasion to make an examination of Ruby McClain; that her mother and stepfather were with her; that he found some abrasions of the orifice of the vagina and a little blood, and in his opinion there had been a penetration into the vagina.

On cross-examination he stated there are two definite ways of telling whether a woman's chastity has been violated by the hymen; that he would say this, that the hymen had been stretched to the point of breaking; that there are two kinds of examinations, inspection by bimanual and miscroscopic; that he did not use the microscope.

The state rested and the defendant demurred to the evidence on the ground that there is not sufficient proof to warrant the case to go to the jury, which was overruled.

On the part of the defense, Dugan Smith testified he lives half a mile east of Choteau, east end of the "Y"; has operated a filling station and tourist camp the past four or five years. First saw the defendant at the preliminary hearing; that he did not have a conversation with Mr. Al-

corn on the 15th day of October; that the defendant Alcorn did not drive up to his place with Ruby McClain and get out of the car and have a private conversation with him at any time.

He further testified that all of his cabins were rented and occupied on the night of the 15th of October; several cabins were rented to some Indians by the week. Around 9 o'clock that night a family in a car with a trailer and an Arkansas tag rented a cabin; the man coughed all night and they kept their lights on. There was only one cabin vacant and it was let about 3:30 the next morning, but not to Charley Alcorn.

On cross-examination he stated Pete Garner rented the vacant cabin. He gave him the key around 3 o'clock Sunday morning and he saw him there at 8 o'clock that morning.

On redirect he stated that Judge Wilkerson was there and talked to his wife, didn't remember of any other lawyer being there. That the first time he saw the girl, Ruby, was here at the preliminary examination.

Mrs. Ruby McClain testified that she is the wife of Oscar or O. S. McClain; they live over by Rose; have been living there six years; that her husband is the grandfather of Ruby McClain; that she first saw Ruby Saturday on October 15th in the Graham-Mercantile, down town, and on Sunday morning about 5:30 Ruby came to her house and hollered "Grandpa"; she got up, opened the door and Ruby came in; her husband was in bed, and Ruby sat down on her pillow and they talked while she dressed and started breakfast; that Ruby said there was nothing wrong between her and Charley Alcorn.

Mark Hanna, her stepfather, and his wife, Ruby's mother, came there about an hour and a half after Ruby

came. They came in; her mother said, "Come on, Ruby, and let's go home." Ruby said, "Grandpa, are we going to talk about what I told you we would?" He said, "Yes, if you want to," and so Ruby told us what was in this letter she had written to her grandmother. She told her stepfather, Mr. Hanna, that he knew what he did to her, and that was the reason that she was not going home. The conversation lasted about 35 minutes; she said like this, that the first time that he had tried to come to bed with her she jumped up and hollered, and he ran and got a water bucket and acted like he was getting a drink of water; and she got up and moved her bed on in to her mother's bed; she told Mr. Hanna this right before all of us, and said she laid down again and he was over her again and she jumped up and hollered for her mother, and her mother told her to lay down, that she would get up and spank her, and she said he had really committed the crime the first time he did this. Then she told him about a year ago in August, when she went to her Uncle Mack's at Seminole, that he had really committed this crime on her person on Friday before she went to Seminole on Monday, and that was the second day of August when she went to her Uncle Mack's, and she said when she came in from skating that he tried to make her strip off before him, that is what she told Mr. and Mrs. Hanna, right before us.

On cross-examination she stated that she married Oscar McClain five years ago Thanksgiving Day.

Oscar McClain testified that he has lived continuously at Rose Prairie since the spring of 1920; that Ruby McClain is his grandchild; that on Saturday night, October 15th, he saw Mark Hanna at Kansas, and had a conversation with him. He asked if he had seen Ruby, and he told him "No," said he was looking for her, and that "I had stole her out for Alcorn." He said, "Mark, do you and

Becca know about that letter she wrote about a year ago," and he said, "Yes, we know all about it," and Becca says, "I am her mother," and she stated that it had been four years since Ruby had stayed at home, and he said, "Listen, my wife met this girl on Saturday, and she told her this, you know that the same thing is going on now that was when she wrote this letter to her grandmother in Arkansas," and he told Mark, "You are the man I am looking for, it ain't Alcorn."

He further testified that when Ruby came to his house they were in bed, and after breakfast he told her that Mark Hanna and her mother were coming there to get her and said, "Ruby, will you tell them face to face what you are telling me?" She had told him what she had written her grandmother. He had never seen this letter up to this time. "Will you face them and tell them what you are telling me when they come after you?" She said, "I will if you won't let them beat up on me." He said, "They won't beat up on you here, they may whip you when they take you home." When they came in Becca said, "Come on, let's go home." She didn't start. Becca said, "Come on, Ruby, let's go home". Ruby said, "Grandpa, I thought we were going to talk this over"; and he said, "We are. She is going to tell on you, Mark, about when you abused her and all that," and she commenced and told them what she had told him before they came in.

As a witness in his own behalf the defendant testified that he lives in Rose, has lived there a year last August, became acquainted with Ruby McClain while she was working for a school teacher, taking care of her baby and living about a block north of his place. That around 8 o'clock he started to Salina and Pryor to turn in his gas reports and the money he had taken in to Joe Lewis, and was stopped by signaling of lights on a car he passed.

The car pulled up beside his car, someone jumped out and came to his car, and it was Ruby; she said, "I want you to take me to Pryor"; he said, "Well, I can't do it, Ruby, I have not got time"; she said, "Well, we started to Pryor with these kids, they want to leave the highway and I don't want to go with them, I made an appointment with this boy's girl that I would meet her over at Pryor." "The other car drove on as we were talking." He said, "Ruby, I don't like to get mixed up, you are going off places, and running around and slipping off, and I would rather not do it, I am late, I don't want to take you." She said, "I will take all the responsibility if you will take me to Pryor; I ought to have been over there right now; we have got an allnight party planned over there, me and this Potts girl." He said, "How are you going to get back?" She said, "That car there is going to bring me back." He said, "What time are they going to get you?" She said she didn't know. He said, "You better tell them I have got to get back, I can't stay over there." She said, "Catch up with them." "We caught up with them and she said to the Wyatt boy, 'You meet me there at 9 o'clock.'" He said, "All right". "We went on to Pryor by way of Locust Grove, and Choteau; we got to a house by the side of the road; she said, 'Now, stop here,' and got out and went in the house; in four or five minutes she came back and said, 'Gwendolyn Potts lives here, they are down town.' We started on and went down the main street of Pryor." He said, "We had better go back to where this girl was to meet you." She said, 'Yes,' and we went out there; he got out and went in, but did not see the Wyatt boy, or the other boy and she said, "I will go in and see," and she came back and said, 'No, there is no one in there.' We waited to see if they would drive up, stayed about an hour and she said something about going to the Sunshine Cafe,

and he said, "All right," and they came into Pryor, parked the car in front of the cafe, he took a beer and she took a coke, they returned to the car and drove back to the Silver Moon to see if the boys had come for her. As they were driving down the street she said, "Wait, there is Gwendolyn Potts"; and she called her; she came to the car and he pulled down to the side of a schoolhouse; they stopped there around 25 minutes, then they drove around the main part of Pryor and looked ifor the boy's car. She said the only place where they could eat is the Red Heart Inn, south of Choteau about three miles, and they went to the Red Heart Inn. It was then somewhere around midnight, and stayed there until 4:30; they got in the car and left and drove back on 33 north and east until they got to her grandfather's place and did not stop at any place from the time they left the Red Heart Inn until he let her out over at Rose. That he did not see Dugan Smith on his way down there and did not stop or go in any of the Dugan Smith cabins that night; that he did not have sexual intercourse or attempt to have intercourse with Ruby McClain at any time. That on their way back she told him about her stepfather trying to get in bed with her; that was after she told him she was leaving home that night; he asked her why she was leaving home, and that is what she told him.

Cross-examination.

"Q. You say that Ruby told you on the way home that her stepfather was trying to have sexual relations with her? A. She did; yes, sir, to that effect. Q. What words did she use? A. She told me about a year before about him getting up and coming to her bed, and she recognized him, and she screamed, and he ran to the water bucket and acted like he was getting a drink. Q. What did you say? A. When she finished up her story, I said, 'Well, if that is the case, Ruby, I don't blame you for going to your

grandfather's, but I am not telling you to leave home at all, that is your business."

He further stated that at her suggestion he let her out on the highway where an open road runs a quarter back to her grandfather's house.

On redirect he testified that he saw Ruby that Sunday on the street near his place, when her stepfather called him out of his place of business and talked to him and was cussing. He told him to cool down and talk like a man and he would talk with him. Ruby started away, her stepfather ran and caught her, and she kicked at him and pulled back. Her uncle, John Hall, assisted and they put her in the car.

The state in rebuttal recalled Mrs. Mark Hanna. Asked: "The morning you went to Mr. McClain's house; state whether or not there was any conversation in your presence in which Ruby made the statement that your husband had been intimate with her and had improper relations with her," answered: "No, sir." Asked whether or not Ruby undertook to run away that morning when her husband was talking to the defendant, answered: "No, sir."

Mark Hanna, recalled, testified he would be 37 years old in December. Asked "whether or not there was any conversation that morning at Mr. McClain's in which Ruby told you there in his presence that you had been intimate with her, and that you had attempted to be intimate with her," answered "No." Asked: "Did you ever make any improper advances in any way of being intimate with Ruby," answered, "No."

Ruby McClain, recalled, asked: "Did you hear your grandfather tell what you had said up there in the presence of your stepfather and mother?" Answered: "Yes,

sir." Asked: "Did you make any such statement as that to him at his house that morning?" Answered: "No, sir." Asked: "Did Mark Hanna ever try to be intimate with you and have any improper relations with you, Ruby?" Answered: "No, sir."

Cross-examination.

The defendant again offers in evidence Defendant's Exhibit "1" for the purpose of showing she said one time one thing and another time another thing.

The court overruling state's objection stated: "It will be admitted for impeachment purposes."

Thereupon counsel reads Defendant's Exhibit "1" to the jury as follows:

"Defendant's Exhibit 1.

"Rose, Oklahoma.

"Sept. 7, 1937.

"Dear Grandma,

"I guess you thought I had forgotten to write but I have just been putting it off so I decided to write. Grandma, if you possibly can I wish you and some one would come after me Sunday. Winter before last Mark tried to attact me and then two nights before I went out to Uncle Mack's this summer mother and all the rest of them were asleep and I was still awake and he tried to get in Bed with me and I hollered for mother and he ran out of the room and acted like he was getting him a drink and then I moved me a pallet in there by their Bed and Mother had gone back to sleep and he was down on his hands & knees just ready to get on me and I screamed just as loud as I could he jumped back and then acted innocent like he didn't do anything. I told mother and she said o you was just dreaming and imagineing things and I never went to sleep that whole night long and thats not all I haven't had a night's sleep since I come back from Uncle Mac's only when I stay alnight with some of my girl friend, I'm afraid to. Uncle Mac & Aunt Lucille just begged me to stay out there and go to school I'm a fool for not staying I guess

I didn't tell them about it. Saturday night we had a big fuss and we haven't spoke since and If you don't come after me I don't know what I'll do, But there's one thing sure I am not going to stay here If I have to drink poison or. kill myself that's all there Is to it.

"I just hate him, the old Devil. If you come come real early Sunday morning while I'm at Sunday School and we'll go down to the house and get my clothes and leave. I hate to even have to stay there until then. Grandma I'll do anything under the sun for you If you will come after me. I want you to ans. on return mail and tell me whether your coming are not so I can be as near ready as possible. They can't keep me from leaving because I know lots more than what I'm telling you in this letter. I'll tell you when I see you I'm not even going to try to go to school. Maybe I can get me a job at some kind to support me if I can't I'll do something to help you for a while when you write just write on a card and don't mention anything you would care for mother reading because she always reads my letters. If you can come are get any way for me to come just say I'll come to see you Sunday Ruby C. Be sure & come If you possibly can at all Because I've got to do something. Mother doesn't care a thing in the world for me are she wouldn't do me like she does. They every one talk to me like I'm a dog or something else. Grandma be sure and come If you possibly can please and I'll pay you for it. just as soon as I can do something to get some money. Well, I guess I will close. Be sure and come if you can your loving Grandaughter.

"Ruby."

Redirect:

"Q. Ruby, tell the jury how you come to write that letter? Defendant's objection overruled. A. Because I got mad at my mother and dad, because they wouldn't let me do as I please. Mr. Wilkerson: The state rests."

The transcript of the testimony covers 170 pages, but the foregoing is a substantial statement of the material evidence in the case.

In the view we take of the record and the duty devolving upon this court as to the disposition to be made of the case, the only question we deem necessary to consider is the sufficiency of the evidence to sustain the conviction.

The grounds of the motion for a new trial and assigned as error are: That the testimony of the prosecutrix is contradictory; that she was not corroborated by the testimony of any other witness; that the testimony of the other witnesses called to corroborate her was in conflict with her testimony; and that the facts and circumstances surrounding the alleged commission of the offense are not corroborative of her testimony.

The rule must be taken as settled in this state that while a conviction for statutory rape may be had on the uncorroborated testimony of the prosecutrix, this is only warranted when all the other facts and circumstances of the offense are corroborative of her testimony and her statements are not inconsistent or contradictory. Without such surrounding facts and circumstances, the bald statement of the prosecutrix against the defendant would be so devoid of testimonial value as to render it unworthy of belief. Self v. State, 62 Okla. Cr. 208, 70 P. 2d 1083; Williams v. State, 61 Okla. Cr. 396, 68 P. 2d 530; Ferbrache v. State, 21 Okla. Cr. 256, 206 P. 617.

The methods of impeaching a witness are well defined. The three general classes of evidence by which a witness may be impeached are:

"(1) Character evidence tending to show that the witness lacks truthfulness, (2) That on former occasions he has failed to state material facts, or different or conflicting facts testified to by him on the present occasion, (3) Evidence showing that his present testimony is materially variant from acts done, or statements made, at other times."

"Another mode of discrediting a witness is by showing (either through cross-examination or by other witnesses) that the witness has at another time stated the opposite of what he now states or has otherwise varied from his present story. Here, 'that which sets aside his credit and overthrows his evidence,' in the words of Chief Baron Gilbert, is 'the repugnancy of his evidence,' inasmuch as 'contraries cannot be true,' and therefore he must be in error in at least one of the two statements; and if in error once, then perhaps also in other undetected instances. The probative value of this process—showing error and the capacity to err—is therefore much the same as in that of the preceding section, though the mode is somewhat different. The probative force thus arising merely from the inconsistency and the apparent falsity of one of the two statements, it follows, on the one hand, that the admission of the prior inconsistent statement does not violate the Hearsay rule, and, on the other hand, that it is not to be taken as affirmative evidence of the fact stated in it; for the reason, in both cases, that it is not offered as a testimonial assertion, but only as inconsistent with the present statement." 1 Greenl. Ev., 16th Ed. sec. 461.

In the case of Self v. State, supra, this court held:

"In prosecution for statutory rape, the credibility of the prosecutrix may be impeached by proof that she made statements relative to the issues contrary to what she has testified to on the trial."

In MacLaurin v. State, 34 Okla. Cr. 324, 246 P. 669, 671, we said:

"It is true that this court has held many times that there is no rule of law which forbids a jury to convict for the crime of rape on the uncorroborated testimony of the prosecutrix, provided they are satisfied beyond a reasonable doubt of the truth of her testimony. It does not follow, however, that a conviction upon such testimony is to be arbitrarily sustained under all circumstances. In some states, corroborating evidence is required by the statute."

In the instant case the testimony of the prosecutrix should be considered in the light of all the attending circumstances, and we think they cast so much doubt upon the credibility of her testimony that the conviction should not be permitted to stand. Her testimony is inconsistent and contradictory.

It is always legitimate to consider whether the subsequent conduct of the prosecutrix is the usual and natural conduct of an outraged woman as bearing upon the credibility of her direct testimony, and it appears that the prosecutrix made no complaint of injury or mistreatment on the part of the defendant to her grandparents that morning.

The charge of illicit sexual relations is easily made, and often inspired by malice, hidden motives, or revenge, and evidence to establish the same may be easily fabricated and hard to disprove. As has been well stated by an able jurist: "There is no class of prosecution attended with so much danger, or which affords so ample an opportunity for the free play of malice and private vengeance. In such cases the accused is almost defenseless."

The state only demands the punishment of a citizen when his guilt has been clearly established according to the forms and rules of law, prescribed for ascertaining his guilt. It is not to shield the guilty, but to protect the innocent, that the courts are steadfast in upholding the forms and rules of law by which it may be lawfully determined who are guilty.

In our opinion no person charged with crime should be convicted on such improbable, inconsistent, and unreasonable testimony as that given by the prosecutrix in this case.

Upon careful consideration our conclusion is that the evidence was insufficient to justify or sustain the verdict. This conclusion renders it unnecessary to consider the other questions in the case.

It is the opinion of the court that the evidence is entirely insufficient to support the conviction. The judgment of the district court of Mayes county herein is therefore reversed and the cause remanded, with direction to dismiss.

BAREFOOT and JONES, JJ., concur.