## WOOLRIDGE v. STATE.

No. A-11847. Nov. 10, 1953.

(263 P. 2d 196.)

Banker, Bonds & Wilcoxen, Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace. Asst. Atty. Gen., and Ed A. Edmondson, Jr., County Atty., Muskogee County, Muskogee, for defendant in error.

POWELL, P. J. Boyd Woolridge, the plaintiff in error, hereinafter referred to as defendant, was tried before a jury and convicted in the district court of Muskogee county, for the crime of rape in the first degree, and sentenced to serve fifteen years in the state penitentiary.

For reversal two propositions are urged:

(1) That the evidence is not sufficient to sustain the verdict of the jury and the judgment and sentence of the court.

(2) That the plaintiff in error did not have a fair and impartial trial such as is guaranteed to him by the constitution and laws of the State of Oklahoma.

The second proposition is answered by paragraph five of the syllabus in Chesser v. State, 63 Okla. Cr. 84, 73 P. 2d 191, and may be referred to.

We find from the evidence that the prosecutrix, Martha Jean Copeland, was the stepdaughter of the defendant and aged 12 years on January 17, 1951, at the time the acts charged were alleged to have occurred. At that time the prosecutrix, her mother, her nine year old brother and the defendant Boyd Woolridge were living at the Huber Hotel in Muskogee. The wife was taking treatments at a hospital in Muskogee during this time. The defendant was a restricted Indian, and his wife, Iva Lee Woolridge, was a white woman who had been previously married and had a married daughter living in Oklahoma City, and a stepson living in Tulsa. The little girl, Martha Jean, and the young boy had lived with the defendant since their mother married him. The mother and defendant had many disputes concerning the money that the Government allotted to him each month, and several divorce suits had been filed, but dropped. The defendant was addicted to drinking liquor to excess.

Martha Jean Copeland testified that the next night after her mother went to the hospital that she and her brother went to a picture show, returned to the hotel and went to bed. They slept together. The stepfather slept in a separate bed. On direct examination Martha Jean stated there were two rooms, but on cross-examination was not sure. She testified that defendant came in after she and her brother had gone to bed. Said she:

"He came in and I think he went in his room first and he was drinking. Pretty soon he came over to my bed and went to pestering me. My brother had already went to sleep and I couldn't wake him up and he kept pestering me. Q. What do you mean by 'pestering' you? A. Well, feeling around on me. Q. What happened then? A. He'd go back in his room then and get another drink and come back and pester around on me and then he'd go back and get another drink and come back and pester me again."

She was further asked and answered:

"Q. How long did that go on, that he kept pestering you while you were in your own bed? A. Well, for a long time and finally then I went to sleep. * * * Q. Did anything further happen that night after you had gone to sleep? A. Yes, sir, when I woke up I was in his bed."

Witness stated that she did not know how she got in defendant's bed. She stated that Boyd was on her; that she did not know what the word intercourse meant, but did know what private parts were. She stated that defendant put his private parts in hers, and after a while that she got back in her own bed; that this must have been around 2 o'clock in the morning; that she went to sleep and slept until time to go to school the next morning. She said that she noticed that she was "a little wet down there" but noticed no blood. She did not tell her teacher, her mother or anyone else about this. She stated that her mother was taking electric shock treatments and that she was afraid to tell her then. Prosecutrix stated that the only time defendant ever acted as he did was the next night after her mother entered the hospital in Muskogee.

Witness stated that her sister who was living in Oklahoma City came to Muskogee and got her and the mother and took them to Oklahoma City, and her

mother entered a hospital there. While her mother was in the hospital witness told her sister about the defendant's actions in the Huber Hotel. This was the first time she had ever told anyone. She was then taken to Dr. William E. Hubbard, in Oklahoma City, for examination. This was on March 21, 1951. The record indicates that the complaint was filed the 25th day of May, 1951, and the information the 20th day of August, 1951.

On cross-examination the following questions and answers seem pertinent:

"Q. Did Boyd sit down on the bed at any time? A. A part of the time he'd sit on the bed and a part of the time he was kneeling on the floor. * * * Q. Wasn't that just one long room there at the hotel, and not two separate rooms? A. I don't remember but I know that the door to the other room was open. Q. It's pretty hard for you to remember all these things now, isn't it, Martha Jean, whether that was one room or two rooms? A. Yes, sir. Q. And whether your mother was there or if she was in the hospital? A. Yes, sir. * * * Q. The conversation you had with G. L. [her older brother] is what you are testifying about today, because it's hard for you to remember all these things, isn't it? A. Yes, sir. * * * Q. But there wasn't any blood on your clothes or on the bed sheets on the bed where you and your little brother were sleeping? A. No, sir."

Witness stated that the next morning her stepfather took her and her brother to a cafe to eat and then took them to school. She was asked:

"Q. After you got to school did it hurt you any down there in your private parts, or do you remember about that? A. I don't remember. * *"

Referring to the statements of witness to her sister about the crime charged, she admitted that she did not tell her sister while she was in Muskogee, but that it was after they got to Oklahoma City and at a time that her mother was in the hospital there. She stated that she did not know why she did not tell her when she first arrived in Muskogee.

The prosecutrix was further asked questions and gave answers as follows:

"Q. Do you remember now when your mother sued Boyd for $50,000 for injuries she claimed he had inflicted on her and the jury gave her only $1500? You remember when that lawsuit was tried in court? A. Yes, sir. Q. That was shortly before you told about this alleged incident, wasn't it? A. I don't remember. Q. It was right after your mother got the $1500 when she had sued Boyd for $50,00, that you complained about him having bothered you, wasn't it? A. I guess so. * * * Q. Martha Jean, did you come with them when they came over here and your mother had sued your stepfather for $50,000, were you here at that time, do you remember? A. I don't remember but it seems to me like I was. Q. You were here with them when that case was tried before a jury, weren't you? A. Yes, sir. Q. Your big sister came with you too, didn't she? A. Yes, sir. Q. I believe she was the one that made the big commotion in the courtroom when the jury came in and returned a verdict for only $1500, do you remember that? A. Yes, sir. * * * Q. Didn't you and your mother and little brother go back and live with Boyd after the trial about the money and after all this was supposed to have happened? A. I don't remember. Q. You did live together down at McAlester recently, didn't you, you and your mother and stepfather and little brother? A. Yes, sir."

G. L. Copeland testified that he lived in Tulsa and that he was a half-brother of the prosecutrix; that some time in May, 1951, Martha Jean visited him in Tulsa and related to him the matters forming the basis for the charge that was the next day filed in Muskogee, where he took his sister for conference with the county attorney. The complaint was filed the 25th day of May, 1951.

Helen Barger, the record librarian at the Muskogee General Hospital, testified from the records in her possession that the mother of the prosecutrix was a patient in that hospital from January 6, 1951, until January 10, 1951.

Dr. William E. Hubbard, Oklahoma City physician, testified that on March 21, 1951, he at his office in that city made a vaginal examination of prosecutrix and found that her hymen had been ruptured some time previously, but had healed. It was his opinion that some time previous to his examination a penetrating object had entered the vagina, but he could not express an opinion as to what that object may have been, as it could have been from a finger, a fall or striking something. He stated that if she had an intercourse causing the rupture there might have been quite a hemorrhage, but usually just a small amount of blood was present and the chances were there would be no bleeding the following day. In his opinion, she had been penetrated at some time between three or four weeks to six months prior to the examination. There would be some pain connected with the rupture, but he could not say for sure how long it would last, but ordinarily it could be expected to last about half an hour.

The prosecutrix was recalled as a witness and testified that she did not remember ever having fallen or having had an accident around her private parts, and she reiterated that the defendant had placed his private parts in hers.

The defense interposed a demurrer, which was overruled.

Boyd Woolridge testified in his own behalf. He stated that he was a restricted Indian, 47 years of age, and with oil royalties coming in to the Indian Department; that he was married to Iva Lee Woolridge, and that her two children by a previous marriage, Martha Jean and her little brother, had lived with him during the marriage. On several occasions there had been divorce proceedings pending between the defendant and his wife. In January of 1951 they were staying at the Huber Hotel in Muskogee so that his wife could take treatments at the General Hospital, which only required about two hours each day, and the defendant would wait at the hospital until his wife had finished taking treatments and then put her in the car and take her back to the hotel. A divorce case filed by the defendant's wife was pending at the time. She was seeking $50,000. After the wife had taken four treatments a daughter who lived in Oklahoma City came to Muskogee and got defendant's wife and the children and took them back to Oklahoma City. The divorce was granted in February and the wife awarded $1,500 alimony, after which the decree was set aside and they continued to live together. Witness swore that he never molested prosecutrix in any way, and never at any time had sexual intercourse with her. The prosecutrix, her brother and their mother had continued to live with him in Muskogee and McAlester from the time the divorce decree was set aside until January, 1952, before the trial in March. Defendant admitted that he had been convicted of being drunk in public, driving a car while his license had been suspended, operating a vehicle while under the influence of liquor, leaving the scene of an accident, and a number of ordinance violations in the police court of the city of Muskogee. He remembered that he had told the county attorney after his arrest that on one of the nights while his wife was taking treatments she stayed in the hospital overnight and that the children were in the hotel with him. Witness stated:

"I never bothered her [Martha Jean] in my life. One time the little boy and girl came in the room when we were living out on Okmulgee and they said, 'Boyd, we like you', and she reached up and kissed me. That was one morning just before they were leaving for school, and I stooped down then and gave them a hug and the little boy kissed me on the cheek and I said: 'You are some sweet children, and I'll be just as sweet to you as you are to me.' "

He stated that he clothed the children, sent them to school and treated them just as if they were his own. He testified that he had to whip the children with a belt once when their mother would not, because they had been riding a bicycle he told them not to ride because it was a stolen bicycle that had been hidden in their chicken house.

Witness further testified to the following incident taking place while they were temporarily at the Huber Hotel, Muskogee, and being the day the sister came over from Oklahoma City and took the mother and children away with her:

"\* \* \* one morning they [the children] seemed to be real anxious to get off to school rather early and I figured there must be some reason for it, so I went over to the dresser and went through my billfold and noticed there was some money missing, and I knew there hadn't been nobody there to visit us and nobody else could have taken it and on account of them being so anxious to leave early, I figured that one of those kids had got it so I figured out then how I could find out which one it was.

"Q. Just go ahead and tell us what you did. A. Well, it was about time for them to go to school so before they left I sat the little boy down over here and sat the little girl down over here, and I said, 'Jean, you pull your shoes off and the first shoe she pulled off the change just poured out of it so I had her pull off her sock and there wasn't anything in it and then I had her pull off her other shoe and sock and there wasn't any money in either of them, so then I searched the little boy and had him pull off his shoes and socks and he didn't have any money on him so I told him I was going to give him some money and I did, but I didn't give the little girl anything."

On cross-examination the county attorney, concerning defendant's drinking, asked him:

"Q. In fact, haven't you told the officers at the police station that when you have been drinking a lot or when you are drunk that you don't know what you are doing? A. No, sir; never have. Q. And that you don't remember what you did? A. No, sir. Q. You never told them that? A. No, sir. Q. And, haven't you told the highway patrolmen you didn't remember resisting arrest when in fact you had resisted arrest? A. No, sir, I did not. If you want to know what happened, they knocked me on the head and beat me up and then said I had resisted arrest."

On rebuttal the county attorney made no attempt to prove matters that the questions would indicate to the jury he could support by evidence and that evidently had impressed him and probably the jury as being true. Such tactics are unfair and cannot be approved.

Thus the evidence ended.

There is no dispute between the parties as to the law involved. Our problem is the application of the law to the facts recited, which by that very reason we have detailed to an extent that otherwise could not be justified.

This court early in its history pointed out that it did not hold with some, as a matter of law, that rape could not be established by the uncorroborated testimony of the prosecutrix, but in common with all courts recognized that without such corroboration, her testimony must be clear and convincing. Morris v. State, 9 Okla. Cr. 241, 131 P. 731, 735; Wines v. State, 7 Okla. Cr. 450, 124 P. 466; Louis v. State, 92 Okla. Cr. 156, 222 P. 2d 160; Self v. State, 62 Okla. Cr. 208, 70 P. 2d 1083, 1091.

In the case of De Witt v. State, 79 Okla. Cr. 136, 152 P. 2d 284, 289, involving a thirteen year old girl, we said:

"From an early date this court has adopted the rule that one may be convicted upon the uncorroborated testimony of the prosecutrix. \* \* \* But we have limited this rule with an exception which is as well established as the rule itself. *It is that the testimony of the prosecutrix in a rape case must be clear and convincing, and where it bears upon its face inherent evidence of improbability, is contradictory, inconsistent or unreasonable, it will be held as insufficient, and*

*under these circumstances must be corroborated to the extent of making it sufficient. * * *"* [Emphasis now supplied.]

We have read the entire record carefully, and while it is possible that the defendant penetrated the prosecutrix, which however slight would be sufficient to convict, 21 O.S. 1951 § 1113, still, the fact that the prosecutrix did not cry out or thereafter tell her small brother who slept with her, or tell her school teacher the next morning, tell her mother later, or even tell her sister when she came to Muskogee for her a few days after the alleged act, but waited until nearly two months later and apparently the physical examination in Oklahoma City may have been influenced by litigation that did not turn out to the satisfaction of the sister, cannot be cast aside as of no value. Then the fact that there was no blood on the clothing of prosecutrix or on the bedding after the alleged act is of significance. The physician testified that the hymen had been torn at some time prior to his examination but had healed, and could have been caused by a finger or injury in a fall at play. It is significant that though on rebuttal prosecutrix was asked if she had hurt her privates by some accident at play, and she could not remember that she had, she was not asked by either the state or defense whether or not she had used her finger or any object that could have caused the tear, or whether or not she and some youth had engaged in sexual intercourse. So we conclude that the injury to the hymen, standing alone at a time eight weeks or more after the alleged act, is not sufficient corroborative evidence under the attending circumstances in this case. Workman v. State, 62 Okla. Cr. 81, 70 P. 2d 133; Alcorn v. State, 70 Okla. Cr. 386, 106 P. 2d 838; Wines v. State, supra. No complaint was made to the officials until nearly five months after the alleged act. The fact that there was opportunity cannot be considered as corroborative evidence. Self v. State, supra.

But the testimony of the prosecutrix and the evidence as a whole is uncontradicted and is convincing that the defendant was drinking the night of the alleged act, and was intoxicated. In her words, he was "pestering" her. She said that he felt over her; she described defendant as sitting on the side of her bed and then kneeling on the floor; that later she wiped something wet off of herself, but emission without penetration is not sufficient to constitute the consumated crime of rape. Kitchen v. State, 61 Okla. Cr. 435, 69 P. 2d 411. After a careful study of the entire record, it is our conclusion that the physical facts and other testimony were sufficient to sustain a conviction for the included offense of assault with intent to commit rape, and in the furtherance of justice, this court will modify, and does hereby modify the conviction for rape in the first degree to that of the included offense of assault with intent to commit rape, and the punishment assessed the defendant is reduced from 15 years in the State Penitentiary to a term of five years in the State Penitentiary, and as thus modified the judgment is affirmed, under the precedent of Kilpatrick v. State, 75 Okla. Cr. 28, 128 P. 2d 246; 22 O.S. 1951 § 1066.

JONES and BRETT, JJ., concur.