**Paul EUBANKS, Plaintiff in Error,**

**v.**

**The STATE of Oklahoma, Defendant in Error.**

**No. A–12591.**

Criminal Court of Appeals of Oklahoma.

June 25, 1958.

Roy Frye, Jr., Sallisaw, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

This appeal comes on from the district court of Sequoyah County, where the plaintiff in error, Paul Eubanks, hereinafter referred to as defendant, was tried before a jury and convicted of the crime of rape in the first degree, alleged to have been committed on his thirteen-year old daughter. The jury being unable to agree upon the punishment to be assessed, left that to the court, and the Hon. E. G. Carroll, trial judge, sentenced the defendant to serve twenty years in the State Penitentiary at McAlester.

The charging part of the information reads:

"* * * that Paul Eubanks did, in Sequoyah County, and in the State of Oklahoma, on or about the 4th day of September, in the year of our Lord One Thousand Nine Hundred and Fifty-seven, and anterior to the presentment hereof, commit the crime of first degree rape in the manner and form as follows, to-wit: That is to say, the said Paul Eubanks in the county and state aforesaid, and on or about the date aforesaid, then and there being, did then and there knowingly, wilfully, unlawfully, intentionally and feloniously carnally know and have sexual intercourse with one Betty Jane Eubanks, a female person and not the wife of him, the said Paul Eubanks, the said Betty Jane Eubanks being then and there under the age of fourteen years, to-wit: Thirteen years of age, contrary to the form of the statutes, in such cases made and provided, and against the peace and dignity of the State."

For reversal, counsel presents his case under three propositions:

"First: That the court erred in overruling the motion of the defendant for a directed verdict of not guilty, made at the conclusion of the *defendant's* evidence and that the verdict is not sustained by sufficient evidence, is contrary to the law and in disregard of the court's instructions."

It is contended that the testimony of the prosecutrix is not clear and convincing of the defendant's guilt, and that her testimony was contradictory, inconsistent, and unreasonable, and was obtained through fear, threats and coercion, and was lacking in sufficient corroboration to sustain the conviction.

Both the defendant and the State cite the rule applicable to the testimony of the prosecutrix as announced in the case of Woolridge v. State, 97 Okl.Cr. 326, 263 P.2d 196, and the cases cited therein, and being set out in paragraphs one and two of the syllabus, as follows:

"While there is a line of authority that, as a matter of law, rape cannot be established by the uncorroborated testimony of the prosecutrix, this court early refused to recognize such rule. In common with courts in general the rule in this jurisdiction is that without corroboration the testimony of prosecutrix must be clear and convincing.

"While in a prosecution for rape one may be convicted upon the uncorroborated testimony of the prosecutrix, this rule is limited with an exception which is as well established as the rule itself. It is that the testimony of the prosecu-

trix in a rape case must be clear and convincing, and where it bears upon its face inherent evidence of improbability, is contradictory, inconsistent or unreasonable, it will be held as insufficient, and under these circumstances must be corroborated to the extent of making it sufficient."

This brings us to a consideration of the evidence.

On direct examination the prosecutrix, Betty Jane Eubanks, testified that on September 4, 1957, she was living with her father and step-mother at Muldrow (a town in the Cookson Hills near the Arkansas border); that she was 13 years of age on January 28, 1957 and was in the 6th grade at school. She further testified:

"Q. Betty Jane, on the fourth day of September of this year were you with your father, Paul Eubanks, any? A. Yes, sir.

"Q. Would you just explain to this court and jury where you were with your father that day, beginning from leaving home, we'll say? A. Well, uh, we went up at grandma's, and uh, he had already raised some money up there, and I reckon he borrowed some more off of her, and he went to Big Boy's and bought some beer and he stopped down on the road and told me to drink a can, and I did, and then we went on down the road, and then he had intercourse with me.

"Q. Now, Betty Jane, do you know what the word 'intercourse' means—don't you? A. Yes, sir.

"Q. Betty Jane, in there where this took place, was there anyone else present besides you and your father? A. No, sir.

"Q. Was where you went—just tell us where you were, where this act of intercourse took place? A. Well, it was, uh, out in the woods.

"Q. Was—well, was it in Sequoyah County? It wasn't over in Arkansas? A. No. No, sir.

"Q. It was down in and around between Moffett and Muldrow—is that right—down in the bottoms there? A. Yes, sir.

"Q. Well, if you will, Betty Jane, just—you say he gave you a can of beer? A. (Nods head up and down).

"Q. And what—when you drank this beer, just explain to this jury what happened and where you had this act of sexual intercourse with Paul Eubanks. Was it in the car? A. You mean out in the woods?

"Q. Out in the woods? A. (Nods head up and down.) * * *

"Q. Betty Jane, was this in the day time or night-time? A. Well, it was in the night.

"Q. In the night? A. (Nods head up and down.)

"Q. What time did you get back to your home? A. Well, it was just getting dark. I think it was about seven, and we got back at eight o'clock. What happened after you got back home? A. Well, uh, he tried to make me sleep with him and give me four dollars, and I was crying, wanting to go in there and sleep with my sister, and I give him the four dollars back, and I went in there and slept with Sue.

"Q. On that day did you—or night—did you have intercourse with Paul Eubanks any other time that day or night than this one occasion? A. Just that night."

On cross-examination witness testified that the act of sexual intercourse took place out in the woods on the gravel road between Moffett and Roland; that they did not go too far off the road back into the woods; that they could see the road, and only one car passed along the road. And she further said that they started on the trip about six o'clock in the afternoon and got back home about eight o'clock that evening.

Witness was asked about her testimony given at the preliminary hearing when she said she thought it was still day-light when

they got back from the trip to her grand-father's, but stated that such statement was incorrect as it was after dark.

Witness testified that she slept that night with her eldest sister, Mary Sue (aged 16 on day of trial). Witness further testified that when she made the trip with her father on September 4, 1957, she was wearing a pair of blue jeans, a blouse and panties. She said that she told Mary Sue what had happened when she got home, and that when she took her panties off that night it had a little blood on it. And she further testified that a Mrs. Sevenstar lived just across the street from her, and that she went over that night and told Mrs. Sevenstar that her father had done something to her, and that a Mrs. Trigg was present when she told Mrs. Sevenstar.

Defense counsel again interrogated prose-cutrix relative to her testimony given on cross-examination at preliminary hearing, in response to questions asked by her father, who was acting in the capacity of his own attorney in such proceeding. We note this:

"Q. And you say now that you were scared of your father at that time? (Nods head up and down.)

"Q. Did he threaten to whip you? A. No, sir. I was just scared. * *

"Q. And when your father was questioning you about that night, he asked you this question: 'Isn't it true that we turned home and it was day-light?' And you said, 'Yes', and he said, 'And we didn't stop on no road did we?' Oh here's the question. I'm sorry. He said, 'Isn't it true that I never mistreated you, Betty Jean, isn't that true?' You didn't answer that, and he asked you if you were scared and you said no. Now, do you remember giving that testimony? A. No, sir; I don't remember it."

The evidence from prosecutrix further developed that after the hearing she stayed four or five days with her father's relatives at Roland, and her Aunt Orrie and Uncle Sis and her Aunt Beulah told her not to tell the truth, and that following this and on November 15, 1957, they took her to attor-ney Jack Green's office at Sallisaw, and that he asked her some questions about the event. Counsel questioned her:

"Q. Did you tell him that you were telling the truth? A. Well, I wasn't telling him the truth, but they told me to tell it, see. They had me scared."

Thereupon counsel for defendant read to Betty Jane certain questions and answers that she gave on November 15, 1957, at the office of Jack Green, attorney at law, Sal-lisaw, Oklahoma. The statement was signed and verified by "Betty Jane Eu-banks", on November 15, 1957, and received in evidence as "Defendant's Exhibit 1."

On re-direct examination, the county at-torney was permitted by the court to read to the witness in the presence of the jury ques-tions and answers given by Betty Jane on direct examination at the preliminary hear-ing held before justice of the peace at Sallisaw, on September 17, 1957. And after all this transpired the court propounded a question to prosecutrix:

"Q. I was going to ask you now. You look at that jury and tell them— you tell that jury whether or not that you're telling the truth here today. That's what they want to know, and that's what they've got to have; that's what they've got to decide this lawsuit on—truth and nothing but the truth. I want you to look at them and tell them. If it's not the truth, tell them. If it's the truth, tell them. A. It's the truth."

The second witness for the State was Howard Watts, under-sheriff of Sequoyah County who testified that about midnight on September 4, 1957 (the day the rape was alleged to have taken place), he received a call from Constable Gilliam at Moffett. He went to Moffett and met Jim Higgs at a service station, and from there commenced his investigation. Following his talk with Higgs, he talked with Barbara Eubanks, twin sister of prosecutrix, at the home of Mr. Higgs where she was spending the night. He went from the Higgs home to

that of Nelson Sevenstar, where the prosecutrix and other sisters were spending the night. After this the officer reported the results of his investigation to the county attorney, resulting in a charge of rape being filed against Paul Eubanks.

Mrs. Mildred Sevenstar testified that she lived at Moffett, just across the street from the Eubanks home; that on the morning of September 4, 1957, a group of persons including the defendant and his wife and witness went to pick peas for an employer; that Mrs. Eubanks became ill and defendant took her home and later in the day took her to the hospital; that Betty Jane Eubanks, the prosecutrix, came over to the home of witness about 10:30 at night on September 4, 1957 and stayed until about 4 o'clock the next morning; that she made complaint about her father; said he was drunk and there was nobody home but witness and the other children. Witness said that she had her neighbor, Jim Higgs, call the officers. She said that Barbara Eubanks came over first, and that Betty Jane came over a few minutes later. She testified that Officer Howard Watts, the night of September 4, came to her home and talked with Betty Jane. On cross-examination, witness said that Betty Jane had told her that her father had "tried" to molest her.

Dr. R. L. Currie testified that he was a licensed physician at Sallisaw; that on September 6, 1957, at the request of the county attorney he examined Betty Jane. He said that, "on examination of her female organs there was some injury to the outer part, which showed some bleeding of the hymenal ring and with some tearing of the part and with some blood present on the surface and showed evidence of having been dilated or penetrated by some object and a smear was made of the secretion. It did not show any sign of any spermatazoa present; and otherwise, the examination was negative". He further stated that "the tearing was of recent origin within, say within two days, and there was no sign of any healing or repair as would be seen later on." On cross-examination he testified that he could not determine what instrument was used to cause the tearing or dilation of the female organs, or when the tearing actually occurred, but it was anywhere from one to three days.

We have carefully read the testimony of all witnesses. The Attorney General has called our attention to much of the evidence quoted. The defense interposed a demurrer, which was overruled. Before going into the legal propositions raised by the demurrer, we shall first set forth a summary of the evidence of the defendant, as stated by defense counsel in his brief, and which counsel for the State agrees is a fair summary, as follows:

"Delpha Higgs testified that she lived in Moffett, Oklahoma, beside Mildred Sevenstar and across the street from the Eubanks home, and that she talked to Betty Eubanks on the night of Sept. 4, and Betty Jane told her that her father had tried to molest her (Betty Jane Eubanks); that up until the 6th day of Sept. while Paul Eubanks was at home, the Eubanks home was quiet and orderly, but that after Mr. Eubanks went to jail on Sept. 6th, there was a change, that the cars were coming and going, and loud talking and lots of men around the house all the time, day and night.

"On cross examination, she testified that she saw the five Eubanks children on the night of Sept. 4 and that she saw Betty Jane Eubanks leave with Paul Eubanks and that she saw them again about 8 o'clock and that it was around 4 o'clock when they left.

"Mary Sue Eubanks testified that she is the daughter of Paul Eubanks and that on Sept. 4th she was living at home with her father and sisters and brothers and that Betty Jane Eubanks slept with her on that night and that Betty Jane did not make any complaint to her about her father bothering her or molesting her on that trip and that she did talk to her, that she saw the clothes that Betty Jane Eubanks was

wearing and that there was no sign of blood on her panties or jeans.

"On cross examination Mary Sue testified that she was 16 yrs. old; that Betty Jane and her father got back about 6 o'clock that afternoon and that she did not examine Betty *Sue*.

"Beulah Corbett testified that she is the sister of Paul Eubanks and that she heard Betty Jane Eubanks come up to the jail and tell Paul Eubanks, in the presence of June Jones and Jim Hicks, that her daddy had not bothered her; that she did not threaten or promise her anything to make her testify that way.

"On cross examination Mrs. Corbett testified that she took Betty Jane Eubanks to Jack Green's office to make a statement and that the girl wanted to go to the office. That she gave Betty Jane Eubanks a whipping for not minding her, and not because she wouldn't change her story or anything like that.

"On redirect examination Mrs. Corbett testified that they were all in the room, the same room, at the time that the statement was taken in Jack Green's office.

"Sylvia Jones testified that she was present with Paul Eubanks up in the jail on a date on which there was a hearing on the custody of the children and that she heard Betty Jane Eubanks tell her father that the story that she had told was just made up and that she did not hear anyone promise Betty Jane anything to say that.

"Paul Eubanks testified that he was 47 years old and that he is the father of Betty Jane Eubanks and that he and Betty Jane Eubanks made a trip to his dad's home on Sept. 4, 1957, in order to get money to have a prescription filled for his wife and that Betty Jane went on the trip at her own request; that they left the home at about 5 or 5:30 P.M., in the daylight, they got back about 6 o'clock, that he made the trip up Highway 64 and up the Roland road and that they did not stop anywhere on the road on the way back; that he did not make any indecent suggestions or immoral suggestions to Betty Jane, he did not give her a can of beer and he was not drinking himself and did not drag her out into the bushes and did not have sexual intercourse with her, that he did not offer to give her $4.00 to sleep with him that night, and that he has never told anyone any different story than this. That Betty Jane Eubanks came up to the jail and talked to him and Mrs. Corbett and Mrs. Jones and said that Lola Mae Tuck and Audrey Eubanks had made her tell this story on him, that he has taken his children to church and Sunday School and that they belong to the church at Moffett.

"On cross examination, Mr. Eubanks testified that he was not drinking on that date.

"On rebuttal, the state called to the witness stand, Audrey Eubanks, wife of the defendant, and the counsel for the defendant objected to her testifying and to her even being called to the witness stand as she was an incompetent witness, which objection was sustained by the court after Audrey Eubanks had already been sworn in."

At the conclusion of all the evidence, defense counsel made a motion for a directed verdict of not guilty on the grounds that while one may be convicted on the uncorroborated testimony of the prosecutrix, that such testimony must be clear and convincing, and where it shows upon its face evidence of improbability and is contradictory, it is insufficient, and under such circumstances must be corroborated, which it was contended, was not done in the within case. The court overruled the motion.

There being no dispute as to what the law is in this jurisdiction in a case like the within, the problem confronting us is the application of the principle quoted hereinbefore from the case of Woolridge v. State. This presents a task not without difficulties.

We have recently had the same problem in other cases with some similarity in many respects, which will illustrate what we refer to. See Louis v. State, 92 Okl.Cr. 156, 222 P.2d 160, where case reversed; Woolridge v. State, 97 Okl.Cr. 326, 263 P.2d 196, where first degree rape conviction found erroneous, but evidence found sufficient to support conviction of included offense of assault with intent to commit rape; DeArmond v. State, Okl.Cr., 285 P.2d 236, where case reversed; Reid v. State, Okl.Cr., 290 P.2d 775, where evidence found not to support rape in first degree, but found to support rape in second degree. And by contrast see Epley v. State, 94 Okl.Cr. 308, 235 P.2d 711, and Kidd v. State, 97 Okl.Cr. 415, 266 P.2d 992.

Counsel points out that in the preliminary hearing prosecutrix testified that her father had mistreated her, and then on questioning by her father said that he had not mistreated her, and at the jail where she was taken by her father's relatives she said to her father in the relatives' presence that he had not mistreated her and that her step-mother and half sister Lola Mae Tuck had put her up to saying that he had mistreated her. This was just after the relatives had taken her to attorney Jack Green's office where she had made an affidavit to the effect that her father had not molested her.

The contradictions complained of are present. On the other hand, there are many corroborative circumstances that support the complaint of prosecutrix that she was raped by her father, to-wit: She made complaint, according to her testimony, to her sister Mary Sue. Mary Sue denied this, but the jury no doubt noted that although the father remained at home the children, four girls and two boys at home, two girls being at Fort Smith, were all so disturbed that they went across the street to the homes of neighbors, Sevenstar and Higgs, to stay, and that the twin sister Barbara did talk to Mrs. Sevenstar and Mrs. Higgs, but they were not permitted to testify as to what Barbara said to them. Nevertheless, what she did say was of such import that the officers were called and deputy sheriff

Howard Watts arrived just after midnight and the next day the matter was called to the attention of the county attorney at Sallisaw, and he made arrangements for a medical examination by Dr. Currie the following day. The examination should have been made the 5th, rather than the 6th of September, 1957, but it will be noted that prosecutrix did not live at the county seat and there would be more or less delay to be expected in contacting the various witnesses, arranging for transportation, etc.

Dr. Currie's testimony that the thirteen-year old girl had been penetrated within one to three days prior to the examination was positive.

The statement of the prosecutrix at one point that her father had been drinking, though at another time she said she had seen him drink only one can of beer and that he was not drunk, was probably believed by the jury in that he seemed never to have missed his children leaving the home and spending the night at the neighbors' the night of September 4, 1957.

The jury had for consideration the statement of the prosecutrix that her father's mother and father and her Uncle Sis, and particularly her Aunts Orrie and Beulah, took her to the attorney and made her swear to the statement where she denied that her father had molested her, and then took her to the jail, and had her repeat the denial to her father. She said that she was scared when her father confronted her at the justice of the peace court hearing and that she denied that he molested her. Aunt Beulah at trial did not want to remove gum from her mouth after being ordered so to do by the judge. The jury may have considered the father's relatives headstrong, and that they did influence this girl.

The county attorney attempted to offer the evidence of the step-mother, Audrey, to rebut the contention that she had influenced the girl to say that her father had molested her, but such theory was rebutted by the fact that Audrey was in the hospital when the rape was supposed to have taken place, and for several days thereafter.

Why the county attorney did not call the half sister, Lola Tuck, does not appear.

It is apparent that this young girl was very inexperienced in the affairs of life, if not somewhat backward, due to her background. She did not understand simple words, and persisted in nodding her head in answer to questions.

█ However, from a careful reading of the testimony, we have concluded that the evidence of the State was sufficient to make out a case, if believed by the jury, and that the court did not err in failing to sustain defendant's demurrer, and his motion for a directed verdict of not guilty.

Defendant next argues:

"The court erred in permitting the counsel for the state to call to the witness stand the wife of the defendant who was clearly an incompetent witness and such fact was known to the counsel for the State. Such action requires the counsel for the defendant in the presence of the jury to object to the defendant's wife testifying and thereby causing prejudice against the defendant in the minds of the jurors."

█ Counsel cites 22 O.S.A. § 702 and Turner v. State, 1929, 43 Okl.Cr. 380, 279 P. 525. The statute in question was amended by the 1957 Legislature and became effective on June 1, 1957 and prior to the crime charged. The pertinent part of the statute reads:

"* * * Provided, however, that neither husband nor wife shall in any case be a witness against the other except in a criminal prosecution for a crime committed one against the other, or except in a criminal prosecution against either the husband or wife, or both, for a felony committed by either, or both, against the minor children of either the husband or the wife, but they may in all criminal cases be witnesses for each other, and shall be subject to cross-examination as other witnesses, and shall in no event on a criminal trial be permitted to disclose communications made by one to the other except on a trial of an offense committed by one against the other or except on a trial of a felony committed by one, or both, against the minor children of either the husband or the wife. As amended Laws 1957, p. 167, § 1."

It is finally argued by defendant that the trial court erred in permitting counsel for the State to introduce in evidence the testimony of the prosecutrix given at the preliminary hearing. Cited in support of this proposition is Brewer v. State, 44 Okl.Cr. 361, 280 P. 473, paragraph two of the syllabus, which reads:

"A witness may be impeached by showing that his testimony at the preliminary was different from the testimony given at the trial. This may be done by calling the attention of the witness to the specific questions and answers given at the preliminary which are contradictory. The entire transcript of the testimony of the witness should not be admitted either to show or to rebut contradictions in his testimony."

We affirm the above rule. An examination of the facts developed in that case will disclose that the court ordered the reading of the entire record and defense counsel did not object. In fact, that is what he wanted. The error was treated as harmless and the conviction was affirmed, though the sentence was modified.

█ In the within case, as we have seen, on cross-examination defense counsel interrogated the prosecutrix about certain questions asked her by her father while she was testifying at the preliminary examination, and later during her cross-examination, she was questioned by defense counsel at length concerning the statement that she made and signed at the law office of Jack Green on November 15, 1957, which was shown to have been made in the presence of her father's relatives, and where the state contends she was acting under fear and coercion of such relatives. Throughout the trial there was evidence introduced on both sides of the case on the

**500**

issue of whether the testimony by Betty Jane on direct examination at the preliminary was true or whether the statement she made on November 15 was true or false. The trial judge at the time said:

"The Court: Now, let me make the court's position clear: I'm permitting you to read the testimony taken at the preliminary hearing for the reason that —that it's going to be up to the jury to determine the truth, you know, as to whether or not any of these statements were made under duress or pressure— the statement made at the preliminary hearing—the statements made at Jack Green's office, or the statements being made by the witness on the stand today. It's a question for the jury."

Counsel then remarked: "I have no objection to reading the remainder of the direct examination."

■■ Under the circumstances set out, we think the error harmless. We believe that the punishment assessed by the court should, under the facts and circumstances peculiar to this case, be reduced to the minimum of fifteen years confinement in the State Penitentiary, and the judgment as thus modified is affirmed.

BRETT, P. J., and NIX, J., concur.