## W. D. (BILL) MILLER v. STATE.

No. A-9501.   Aug. 26, 1938.

(82 P. 2d 317.)

J. Scott Vincent, of Cheyenne, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., for the State.

DAVENPORT, P. J.   The plaintiff in error was by information charged in the trial court with the crime of rape in the first degree; was tried, convicted, and sentenced to the state penitentiary for a term of 15 years. From the judgment and sentence W. D. (Bill) Miller, the defendant in the trial court, has appealed, and will in this opinion be referred to as the defendant.

The testimony on behalf of the state in substance is as follows: Ferrell Wickham, the injured party, testified:

"I am eight years old; am in the fourth grade in school; I live with my mother and father Mr. and Mrs. Wickham.  On or about the 11th day of June, 1937, I was visiting my sister Mrs. Whitfield; my sister has two daughters, Joyce Lee and Virgie; Joyce is six years old; I went down to my sister's home some time before noon on the 11th of June, 1937; W. D., or Bill Miller came down to my sister's some time after dinner; he came down on horseback and let us ride his horse; Joyce Lee, Leonard and I rode the horse and went down to the barn

and shop; the next time I saw Mr. Miller after he went to the house was down at the shop; when we went to the shop the first time he did not do anything, then when we went back the next time he took Joyce Lee and I off the horse, he did not take Leonard off, Bill told Leonard to ride down there by the river, and he did. After we got off the horse we went into the shed. Roy's car was in the shed on the north side of the blacksmith shop; it was closed in on all four sides, the carshed was not closed in; we went in the shed by the car. Mr. Whitfield's house is southeast of the blacksmith shop and shed, you can see the top of the Whitfield house from the shop. There was no one present except Joyce Lee, Bill Miller and myself. After we got in there between the car and the blacksmith shop Bill Miller pulled us up on his lap and played with us; he was sitting on the running board of the car. Q. Do you mean, Ferrell, he played with your legs? A. Yes. Q. Did he play with your private parts? A. Yes. Q. What clothes did you have on at the time, Ferrell? A. Just had on our panties and dress. Q. Did he remove your panties? A. Yes. Q. Tell the jury what happened. A. After that he told us to stand on the running board of the car, then he pulled my panties down and put his private part to my private parts. Q. Now, Ferrell, by him you mean Bill Miller? A. Yes. Q. Did he make any penetration then? A. He told us not to tell. Q. I mean did his private organ penetrate into your privates? A. Yes. Q. And after that, did he do Joyce Lee the same way? A. Yes. Counsel for the defendant moved the court to strike that question in regard to Joyce Lee as being wholly prejudicial to the rights of the defendant. The motion was denied and counsel excepted. Q. Joyce Lee, there is one other question—I mean Ferrell too—at the time Bill Miller put his private parts to yours, did he get any secretion on you? A. Yes. Q. Whereabouts on you was it? A. Right about here (indicating). Q. Now, after that, did the defendant Bill Miller say anything to you about telling it or not telling it? A. Yes, sir, he told us not to tell, if we wouldn't he would give us a dime. Q. Did he give you the dime? A. Yes."

In substance, the witness further stated:

"I remained at my sister's until the following day, when I was taken home by my brother-in-law and sister;

my mother went with them on to Cheyenne and my mother returned home about 4 o'clock in the afternoon, and immediately after she returned from Cheyenne I told her what Miller had done to me in the shed down at my sister's. I did not talk to Mr. Whitfield or my sister about what had happened at the shed. I slept with the Whitfield children that night in my petticoat; Leonard is five, and Joyce Lee six. I went home the next morning; when I got home mother and my 13-year-old sister was there; we live about four or five miles from where Mr. Whitfield lives; I played with the children down there at my home the next day; I told my 13-year-old sister what Miller had done some time after dinner. I do not have any idea what I told her; I told my mother just what I am telling here; I could walk just like I always did, my body was not injured at all. At the preliminary trial in Judge Crane's court I testified that I was not sore. Q. Do you know what penetration is, you don't do you? A. No. Q. You don't understand what the word means? A. No, sir. Q. Do you know what secretion means? A. Yes, it means did he get any wet on me. Q. Now, did you testify to that in Judge Crane's court? A. I did not unless you asked about it. Q. Do you remember now whether you told or whether you did not? A. Whether I told you? Q. Told about the secretion? A. I know I didn't unless you all asked me. Q. Who told you, young lady, what secretion was? A. I think Mr. Bevins did? Q. Understand now there is nothing wrong about Mr. Bevins telling you that, that is all right, he explained to you what secretion was? A. He did the other day; he didn't the other time. Q. I understand, but since then he has? A. Yes. Q. He did not tell you what penetration meant? A. No, sir. Q. Now, then, have you ever at any time done that with little boys? A. No, sir. Q. And do you claim Bill Miller did what you said he did was the first time you had ever been done that way? A. Yes. Q. And you want to tell this jury you were not sore in any way? A. No, sir. Q. You were not? A. No, sir. Q. Did you ever tell your dad or your brother-in-law about what your testimony would be before the preliminary or before you was in Judge Crane's court? A. No, sir. Q. You never did? A. No, sir. Q. Now, Ferrell, at the same time that the county attorney and the other people told you what secretion was, did they tell you what your private parts were? A. Yes. Q. Now, at any

time when you were down at the shed you didn't see Miller's private parts did you? A. No, sir. Q. You did not cry, did you? A. No, sir. Q. And as far as your feelings were concerned, you felt perfectly normal, and went to the house with the other little girl? A. Yes, I went to the house."

Mrs. Maggie Wickham stated:

"I am the mother of Ferrell Wickham; on the 11th day of June, 1937, Ferrell was at my daughter's, Mrs. Whitfield's; Ferrell stayed all that day and did not get home until the next morning; I went to Cheyenne with Mr. and Mrs. Whitfield that morning and we did not get back until about 5 o'clock; we left for Cheyenne about five minutes after Ferrell came home; Ferrell remained at home with the other children; I was not with Ferrell by herself until after I came home from Cheyenne; I went in the bedroom to undress and Ferrell came in and says, 'Mother, I want to tell you what happened while I was over at Lilly's,' that is my daughter's name, and I says, 'What;' and she told me about Miller mistreating her and my little granddaughter; Mr. and Mrs. Whitfield had not left for home and I called my daughter and told her to come here, and she says, 'Come on out to the car,' and I says, 'No, come in here,' and she came in and I told her and she went on home."

On cross-examination witness stated:

"Roy and Lilly Whitfield are my son-in-law and daughter; Ferrell told me what Miller had done about five minutes after I returned from Cheyenne; after she told me I questioned her as to where she was and who was with her and all about it. I made an examination of her in a way; I did not ask her whether or not she was sore; I did not take her to a doctor that day; I do not know whether it was two or three weeks after that before I went to the doctor. If Dr. Stephenson says it was the 3d of July, that might be right. The reason I did not go sooner I did not deem it necessary. The county attorney and the sheriff came out to see me, I believe it was Mr. Redden and Mr. Bevins; they did not say anything to me about taking her to a doctor; I don't know whether she was sore or hurt, I just taken her because I thought

it was best. I could not be positive about what time it was I went to the county attorney's office, the reason I did not go earlier to report it there were different things, sickness for one thing. I don't know whether it was the 26th of July or not."

Roy Whitfield, testifying on behalf of the state, stated:

"Joyce Lee Whitfield is my daughter. On June 11, 1937, Ferrell Wickham was at my place; Bill Miller came to my place about 12:30 in the afternoon; he lived at the Hawthorne place about two months. On June 11, 1937, I was living in a little shack facing east, there was a shed and carshed a little ways north west from the house, the building was out of sight from the house; the little shed building had a door on the east with the carshed attached to the shed with no sides excepting where it joined on the shed; my car was in the shed on June 11, 1937. Bill Miller came to the house and wanted my wife to fix a pair of gloves so he could rob a bee hive, and I told him I had a pair of gloves that might be all right and Miller said, where are they, and I told him they were up by the side of the road where I was fixing a flat, they must be up there; Miller went out and looked for the gloves. The children liked to ride the horse and Miller let them ride. I did not learn until Saturday about 5 o'clock there had been any immoral or improper conduct between Miller and my sister. This was on June 12, 1937."

Mrs. Roy Whitfield testified:

"There were two conversations between Bill Miller and myself and other persons, the first one was Saturday after we got back from town and found it out. One occurred down at the well; there was only Roy, Miller and myself present, I went down to the well with two buckets in my hand and Bill Miller says, 'I will get that water for you,' and I says, 'No thank you, I will carry my own water,' and Miller rode on to the well and says, 'Mr. Whitfield, you owe me for getting the cows up for you,' and Roy says, 'I don't owe you a thing,' and Roy begin to talk to him about what he had done, and Miller says, 'What have I done?' and Roy says, 'You know what you have done to those two little girls,' and he says, 'What did those two

little girls tell you?' and he denied he had done anything to the two girls and went on home.

"The next conversation was in the car; we had started to Sunday school and drove by where Miller lived, and as we went by the house he waved at us, and Roy stopped the car and he came up to the car and says, 'Roy I have done wrong and I am sorry, do forgive me and give me a chance, I didn't sleep a bit last night, give me a chance, don't send me back to the penitentiary.' He seemed to be talking to me, he says, 'Go and talk to your father and tell him to come on down'; he never did say what he had done. He said, 'If you will let me go, I will be a man from here on out,' and he looked like he was real sorry, and he was weaving and trembling, and we started on, and just as we were about to get out of sight he started on off."

On cross-examination witness stated Bill said:

"I have done wrong, I want you to forgive me. Q. Didn't he say if I have done wrong? A. He said I have done wrong and want you folks to forgive me."

"That was on Sunday morning; Bill Miller did not use the word 'if' in his conversation. I did not testify in the preliminary hearing. I don't know whether I heard my husband testify in the preliminary or not. You cannot see the blacksmith shop and part of the shed from the house, you have to go up on a rise before you can see it. When Bill came up to the house he tied his horse to a bush about ten feet from the house; the children asked him to ride and he said all right and they untied the horse and brought it up and he helped them on. The children were gone quite a while and I got uneasy and called them; they were gone 15 or 20 minutes on the horse in the lot, the three of them were on the horse. Bill Miller was out there, he was not on the horse with them, they watered the horse, and while they were watering the horse I called again and they came to the house, and Miller came and helped them down. Miller said something about he had to go, and I said 'children get off and let him have the horse,' and he stood around a bit like a fellow just naturally will, and in about five minutes he got on the horse and left.

"When the children came up to the house they asked Bill to let them ride the horse some more, and he gave each one of them a dime; he then rode away and I did not see him any more that day. Ferrell did not complain of any soreness. Roy, my husband, was the first one I told about what mother had told me about what had happened to Ferrell, and Roy said, 'Is that a fact,' and I said, 'that is what they say,' and he said, 'I will find out about it.'

"When we got home Roy put the car in the shed, and said, 'You bring the buckets,' and I went into the house to get the buckets and went on to the well, and that is when the defendant Bill Miller came up and said he had driven the cows up. Roy was at the well when Miller said he would carry the water for me. Miller looked snoopey to me at the time; he looked as pale as could be; he denied he had done anything to the little girls. Roy said, 'What did you do to those little girls?' Q. Did he put any special time or place? I don't think he did, was the answer. Miller said, 'I did not do anything.' When he rode up to the well he had a look of guilt on his countenance. Bill said before he left, 'Well I am not guilty,' and and Roy said, 'I will be seeing about it.' Bill Miller asked Roy, 'What are you accusing me of?' and he says, 'What have you done—you know what you did, Bill Miller, without asking me.' Bill Miller says, 'I am not guilty.'

"I had a conversation with John Hawthorne about occupying the house Miller lived in, I told him we were down there and did not have enough room; Hawthorne did not say Bill Miller was giving satisfaction, but that if Bill Miller wants to leave you can have the house, that Bill was batching and was getting tired.

"Bill told us he had some little trinkets at his place; he had a little matchbox about this long (indicating); he gave the matchbox to me about the time he left; he came by our house and said, 'Here is this thing I have been telling you about'; he said it was a beautiful thing, and it was.

"My husband and I had not been planning for several weeks to get Miller out of the Hawthorne house, nor did we use the scheme of the way he treated our little girls to get him out; I know my husband told Miller, 'There is another person interested in this matter and I will have to

consult him,' and he went to my father's. I was not there when he came back. Q. After Bill gave you those things you wanted you went up to Johnny's? A. No, we didn't. Johnny came up and says, 'I thought you were going to move,' and we says, 'We are.' "

"It must have been a week or more after Bill gave me those things before we moved to his house."

Several pages are taken up in the examination of the witnesses which have no bearing upon the charge in this case. The officers who arrested the defendant in Oklahoma City testified the defendant on his way to Cheyenne questioned them as to whether or not he might be able to get out by serving a short sentence. There is no evidence to show what brought about the conversation, or what crime the defendant was asking about, if any.

Dr. W. L. Stephenson, testifying on behalf of the state, stated:

"I know the little girl by the name of Ferrell Wickham; she is about eight years of age; she was brought to my office on or about the first day of July, 1937, and I made an examination and found that the hymen had been partially ruptured. There was some discoloration around the rupture; it would indicate some penetration of the vagina; the vagina is the organ where sexual intercourse takes place from the hymen to the womb; I do not know what caused the rupture of the hymen; it would have to have been some foreign body."

On cross-examination Dr. Stephenson said:

"The little girl was brought to my office by her mother; I was advised by the county attorney to make the examination; I would not attempt to tell what caused the rupture, sometimes little girls rupture the hymen themselves; it could be done by a sudden fall. The presence or absence is no proof of prior sexual intercourse; I am familiar with what medical statistics show as to the number of young women who have never indulged in sexual intercourse who have perfect hymens, the only statistic I know of is one in 3,000. Medical science agrees that a recent rupture of the hymen will heal in eight to 20 days

after it happens. I made the examination on the 3d of July, 1937. Where a man had raped a little girl eight or nine years of age, the child would be sore for several days thereafter. She would probably be so sore she could hardly walk."

On re-direct examination Dr. Stephenson stated a slight penetration would leave very little soreness.

The foregoing is the substance of all the testimony it is deemed necessary to incorporate in this opinion in order to determine whether or not the defendant had a fair and impartial trial, and whether or not the evidence is sufficient to sustain the verdict and judgment.

The errors assigned are:

"That the trial court erred in overruling the motion of the plaintiff in error for a new trial; the court erred in overruling defendant's demurrer to the evidence; the court erred in overruling plaintiff in error's motion for an instructed verdict of not guilty; the verdict of the jury is not sustained by the evidence and is contrary to law; the court erred in its instructions."

In order to support a conviction on a charge of rape it is essential that the state show not only the assault but also the consummation of the crime charged by having carnal knowledge of the female. Penetration is necessary according to all the authorities to complete the crime of rape.

"Rape" is defined by section 2515, Okla. St. 1931, 21 Okla. St. Ann. § 1111, under the first subdivision thereof, which is applicable to this case, to be

"An act of sexual intercourse accomplished with a female, not the wife of the perpetrator, under either of the following circumstances:

"1st. Where the female is under the age of 16 years."

Section 2518, 21 Okla. St. Ann. § 1114, declares that:

36

"Rape committed by a male over 18 years of age upon a female under the age of 14 years."

Our Penal Code, § 2517, 21 Okla. St. Ann., § 1113, provides that:

"The essential guilt of rape, except with the consent of a female over 14 years of age, consists in the outrage to the person and feeling of the female. Any sexual penetration, however slight, is sufficient to complete the crime."

Under the provisions of the statutes quoted the essence of the crime is the violence done to the person and the feelings of the injured female which is completed by sexual penetration, while the slightest penetration is sufficient, there must be proof to some degree of entrance of the male organ, that is, it must be shown that the private parts of the male entered at least to some extent those of the female.

The charge in this case is one that arouses the passion and prejudice of citizens as well as the jurors, and for that reason it is the duty of the court to closely scrutinize the evidence to ascertain whether or not there is sufficient evidence to establish the crime of rape. In this case the court instructed the jury as to the crime of rape in the first degree, and all included offenses. The jury returned a verdict against the defendant of rape in the first degree, fixing his punishment at 15 years in the state penitentiary.

This court is not unmindful of the rule frequently announced to the effect that the weight and credibility of the witnesses is for the jury, and the court will not reverse a conviction on conflicting evidence where there is substantial evidence supporting the verdict. Witt v. State, 29 Okla. Cr. 357, 233 P. 788, and authorities therein cited.

This court has ruled that rape may be sustained upon the uncorroborated testimony of the prosecutrix, but the court further advises that a charge of rape is one, as stated by Lord Hale, as an accusation easy to make and hard to be proved, and harder to be defended by the accused, though ever so innocent.

If the defendant in this case is guilty of the crime charged, the punishment inflicted is not sufficient. It is necessary to consider the circumstances leading up to the charge brought against the defendant, and the environments at the time the crime is alleged to have been committed. The defendant had visited the home of the sister of the prosecutrix, and had secured the assistance of the sister to fix some gloves, and after being told by the husband, who was a brother-in-law of the prosecutrix, that he had a pair of gloves out where he had been fixing a casing, left the house to go hunt the gloves.

The facts further show the daughter of the prosecutrix's sister, a small son and Ferrell had been riding the horse of the defendant, and they came out and wanted to ride and the defendant permitted them to ride the horse; later on it is claimed they rode down to a shed where the two little girls were taken from the horse and the boy rode on. The state's testimony shows the defendant took one of the girls on each knee and felt of their private parts and then the prosecutrix says he told them to stand up on the running board of the car and he put his private part up to their private parts. In a leading question by the state they asked if he penetrated her, and she said yes, but on cross-examination she admitted she did not know what penetration was and did not know what secretion was, but that Mr. Bevins had told her it meant something wet, or words to that effect.

The mother claims that on Saturday following the alleged offense on Friday, the mother told her daughter,

Mrs. Whitfield, at whose barn the offense is alleged to have taken place. That afternoon Mrs. Whitfield says the defendant came to their place; she started to the well for some water and he offered to carry the water for her and she declined saying she would carry her own water. The defendant then told Roy Whitfield he owed him something for bringing the cows up, and Whitfield said he did not owe him anything, and asked him how he had treated the little girls and the defendant asked him what he meant, saying he had not done anything wrong. About the 3rd of July following the offense on the 11th day of June, 1937, the mother of the prosecutrix took her to Dr. Stephenson's office at Cheyenne, at the request of the county attorney and had her examined. This was several weeks after the alleged occurrence.

The defendant moved away from where he was living, and the Whitfields moved into the house. He had left some little trinkets there when he moved and told Mrs. Whitfield he had left them for her. One was a match-box, a very beautiful piece of work.

The doctor testifying stated there was a slight rupture of the hymen, but he could not tell how it was made, a sudden fall might have caused it, or the little girl might have caused it herself, that there are very few women unmarried who have never had sexual intercourse that have perfect hymen—one in every 3,000. The prosecutrix claims the defendant told her he would give her a dime not to tell. The record shows the defendant at the house, before leaving the Whitfield place, gave each of the children a dime to get off the horse, as they wanted to ride longer. The record further shows the Whitfield family were talking to the defendant, and Mrs. Whitfield was receiving gifts from him up to the time he left the neighborhood.

It is a matter of greatest concern for the courts to protect from violence the outraged womanhood of our

country. The protection of the mother, wife and daughters of our land, and the preservation of the sanctity and security of our homes all depend on the certainty and promptness with which cases of this character shall be visited with the just penalty of the law, and it is the duty of the courts and juries to give it effect, but a criminal trial should be an intelligent conscientious investigation under the laws with every favor for life and even reasonable doubt as to the facts in favor of the prisoner. Our law guarantees to every one accused, regardless of race or color, high or low, whether rich or poor, a fair and impartial trial, and it is the duty of the court to see that the testimony is sufficient to sustain a conviction before imposing sentence upon one charged and convicted of a crime.

The principal contention of the defendant is that there is not sufficient evidence to warrant a conviction of the defendant of the crime of rape. The length of time the family waited before starting the prosecution against the defendant, and the fact that he visited and talked with Mr. and Mrs. Whitfield, the sister and brother-in-law of the prosecutrix, and Mrs. Whitfield accepted gifts from the defendant after the alleged offense, and the further fact that the prosecutrix claims that Joyce Lee Whitfield was present at the time of the alleged rape; and the further fact that the testimony as to penetration is indefinite, and in our judgment is not sufficient to sustain a conviction of rape against the defendant.

While it is a rule approved by this court that where there is any evidence to support a conviction, or where the evidence is conflicting, the appellate court will not review the record for the purpose of ascertaining or determining the weight or sufficiency of the evidence, and ordinarily the verdict approved by the trial court will be allowed to stand, but cases of this character have always been held an exception to such rule, and even exceptional

in this and other particulars from the rule of ordinary criminal cases.

The view we take of this record it is not deemed necessary to consider the other errors assigned by the defendant not specially referred to in this opinion.

After a careful examination and study of all the testimony as shown by the case-made, we hold that the evidence is insufficient to sustain a conviction of rape. Vickers v. U. S., 1 Okla. Cr. 452, 98 P. 467; Kitchen v. State, 61 Okla. Cr. 435, 69 P. 2d 411; Witt v. State, 29 Okla. Cr. 357, 233 P. 788; Dubois v. State, 22 Okla. Cr. 308, 210 P. 1043.

For the reasons stated herein, we are convinced that the evidence against the defendant is insufficient to sustain the judgment, and the case is and must be reversed.

DOYLE and BAREFOOT, JJ., concur.