Bobby Gene DE ARMOND, Plaintiff in
Error,

v.

The STATE of Oklahoma, Defendant in
Error.

No. A–12102.

Criminal Court of Appeals of Oklahoma.

June 8, 1955.

John L. Ward, Jr., Tulsa, Bassmann & Gordon, Claremore, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Herein is involved an appeal by Bobby Gene DeArmond, plaintiff in error, from a conviction in the district court of Rogers County, of the crime of rape, alleged to have been committed on an eleven year old girl, the sister of defendant's wife. Punishment was assessed by the jury at fifteen years imprisonment in the State Penitentiary, the minimum for statutory rape. The penalty might have been death. Tit. 21 O.S.1951 §§ 1114, 1115.

The conviction was at a second trial. The jury was unable to agree when the case was first tried, and was discharged. Special counsel assisted in representing the State at the within trial, and the jury here likewise had difficulty in reaching a verdict, being bothered by the question of corroboration, but finally, after additional verbal instructions, reached a conclusion at 1:15 A.M., the morning of November 19, 1953, after the case was submitted at 4:30 P.M. on November 18, 1953. The trial commenced the morning of November 16, 1953.

There is no dispute between counsel for the State and counsel for the defendant as to the law involved with reference to rape, as the law governing such crime has long been settled in this State. In fact, both sides cite practically the same cases. The great difficulty is in applying the law to the facts.

This is not an easy case by any means. The record of a certainty, as no doubt would readily be agreed, must present a different picture to an appellate court unacquainted with any of the parties, except the trial judge and attorneys, than to the participants

in the trial below, and the view to be arrived at should therefore be as objective as may possibly be. That is our aim in the solution of the issues.

■ Our duty in a case of this nature is far different than in the ordinary case as concerns a review of the evidence. We have again studied the cases of Maxwell v. State, 78 Okl.Cr. 328, 148 P.2d 214; State v. Goodale, 210 Mo. 275, 109 S.W. 9, 11, cited with approval in Williams v. State, 61 Okl.Cr. 396, 414, 68 P.2d 530; Sowers v. Territory, 6 Okl. 436, 50 P. 257; Morris v. State, 9 Okl.Cr. 241, 131 P. 731; Miller v. State, 65 Okl.Cr. 26, 82 P.2d 317; Self v. State, 62 Okl.Cr. 208, 70 P.2d 1083; Woodruff v. State, 74 Okl.Cr. 289, 125 P.2d 211; Weston v. State, 77 Okl.Cr. 51, 138 P.2d 553; Alcorn v. State, 70 Okl.Cr. 386, 106 P.2d 838, and Woolridge v. State, 97 Okl.Cr. 326, 263 P.2d 196. We recommend a review of these cases. And by reason of the facts peculiar to this case, we would emphasize the quotation made by Judge Barefoot in Weston v. State, supra, taken from Sowers v. Territory, supra, at page 258 of 50 P., wherein Justice Tarsney said:

" 'The ordinary rule approved by this court is that where there is any evidence to support the verdict, or where the evidence is conflicting, the appellate court will not examine the record for the purpose of ascertaining or determining the weight of such evidence, and the verdict approved by the trial judge will be allowed to stand; but cases of the character of the one at bar have always been held an exception to such rule, and even exceptional, in this and other particulars, from the rules of procedure in ordinary criminal cases. Sir Matthew Hale, in 1 Pleas of the Crown (Ed.1778) p. 363, distinguishes this character of case and the procedure from other criminal cases, and lays down certain rules and admonitory advice that have been approved by the courts of every jurisdiction since that day. He says: "It is true that rape is a most detestable crime, and therefore severely to be punished, with death; but it must be remembered that it is an accusation easily to be made, and hard to be proved, and harder to be defended by the party accused, though never so innocent." He then mentions some unfounded malicious prosecutions for rape, among them a case tried before himself, where the prosecutrix swore positively to the commission of the offense, and it turned out upon inspection to have been physically impossible for the accused to have committed the offense. He adds: "I only mention these instances that we may be more cautious upon trial of offenses of this nature, wherein the court and jury may with so much ease be imposed upon without great care and vigilance, the heinousness of the offense many times transporting the judge and the jury with so much indignation that they are hastily carried to the conviction of the person accused thereof, by the confident testimony sometimes of malicious and false witnesses." ' " [77 Okl.Cr. 51, 138 P. 2d 554.]

Judge Barefoot, in the Weston case, then goes on to say in the body of the opinion:

"This is what we mean when we say that cases of this character should not be decided upon technicalities, based upon a fixed policy that the verdict of the jury is final and absolutely correct on every proposition of fact. The doctrine that one may be convicted on the uncorroborated testimony of the prosecutrix has an exception to the rule that is as well founded as the rule itself, and that is that where her testimony is contradictory, uncertain, improbable or she has been impeached, her testimony should then be corroborated. And this corroboration should be of such dignity as to give it weight with the jury upon the question that the actual crime has been committed. It should not be such slight circumstances as to leave the court and jury to guess or speculate that the crime has been committed and that the defendant is guilty. Many cases of this nature that come before this Court

for review are of such character that there can not but be a doubt as to the guilt of the defendant, and the least action upon the part of the court or the slightest incompetent evidence causes the jury to return a verdict of guilty.

"The conviction for first degree rape carries with it a minimum punishment of fifteen years in the penitentiary, and a maximum punishment of death or life imprisonment. Certainly there is reason for the rule that has been so long adhered to by this Court that close scrutiny will be given to the evidence before a conviction will be permitted to stand.

"In the past few years numerous rape cases have been affirmed by this Court: [Citing cases.] * * *

"We realize the disadvantage the trial courts are put to in the trial of this class of cases. There is generally strong feeling in the community by reason of the nature of the crime, and often of the persons involved. These charges are often the outgrowth of alleged attacks upon children of tender age. The facts are often given wide publicity in the local communities. If a verdict of guilty is rendered by the jury, the only relief that can be given by the trial court is the granting of a new trial at a great expense to the county. *In the appellate court we have an opportunity to survey the whole record, after it has been reviewed and briefed by attorneys for both the State and the defendant.* [Emphasis now supplied.] * * * it is no pleasant memory to send a man to the penitentiary even for a minimum of fifteen years when there is grave doubt of his guilt, and by evidence of one whom the laws require to be corroborated, and the corroboration is not sufficient. But our sworn duty demands that the law be followed, and that justice shall prevail."

With this background we come to a consideration of the evidence to support the charge. Defendant's principal contention is that the verdict rendered by the jury and is that the verdict rendered by the jury and the judgment entered by the court are contrary to the law and not sustained by the evidence.

▮ It may be stated at once: First, that the evidence of the prosecutrix, Nancy Dirickson, was such as to require corroboration. The trial court so concluded by fact of the giving of instruction No. 8, which advised the jury that the defendant could not be convicted on the uncorroborated evidence of the prosecuting witness. The evidence, as will be hereinafter pointed out, supports such conclusion; and, Second, the evidence failed to establish that penetration past the hymen of the prosecutrix had ever been accomplished by a male organ,—leaving for determination the question of whether the defendant was responsible by a sexual act for a tear of the skin on the perineum, that being the muscle tissue between the rectum and the vagina, and which tear extended almost into the vagina to the edge of the hymen, the hymen showing a slight tear. The penetration, if there was penetration by a male organ, was therefore for about a half to three-quarters of an inch into the vagina. The penetration was as a consequence, enough, if accomplished by the defendant, to support his conviction, as any sexual penetration, however slight, is sufficient to complete the crime of rape. Tit. 21 O.S.1951 § 1113.

The evidence of Nancy Dirickson, prosecutrix and witness for the State, developed that she was the sister of defendant's wife, Mary, and lived with her parents in the town of Oologah about one block from defendant's home. She often visited her sister Mary to babysit with her sister's young child, and to watch the television.

Nancy swore in response to leading questions that at about eight o'clock on the evening of June 19, 1953 she went to the home of the defendant to watch television. She found her sister and her brother-in-law and their little baby at home. Bobby Gene DeArmond was lying on the divan, but he was not asleep and advised his wife to let Nancy turn on the television. After a short while Mary asked the defendant if he would go to his mother's cafe, located near Talala, to get some milk for the baby, and some bread.

She said that defendant asked her to go with him, and her sister told her to go on, so that she went with defendant in his car; that they drove up Main Street to the state highway and about a mile north they turned off the paved highway and drove about one-half mile east. She said that is where "he stopped the car and turned off the lights."

Prosecutrix further testified:

"Q. Then what—just go ahead and relate what took place after that. A. Well, he told me to take off my underwear, and I did, and—

"Q. Go right ahead. A. Well, he got on top of me and stuck his private parts into mine."

Witness further stated that thereafter defendant got up and started the motor, drove on to a bridge, got out and washed his hands, "dried them on his britches legs", and drove on to his mother's cafe. She said that at the cafe he purchased a bottle of pop for her, and some beer for himself. They then drove back to defendant's home. She testified: "He told me not to tell Mary or mama or nobody wouldn't like me." She said that about a week later she told her mother and that her father and mother then took her to Dr. Melloy in Claremore for an examination and treatment. She stated that at the cafe she saw Mr. and Mrs. Casey and Mr. Haynes and other people whom she did not know. She said that she went with Mrs. Casey to show her the "bath room" as Mrs. Casey wanted her to go with her. She said they took soda pop and milk to her sister Mary. She said that she put the pop bottles up and told them "Bye", said to them, "I will see you", and went home. She stated that she saw her mother and grandmother on reaching home, that they were sitting in the yard and she stopped with them.

■ On cross-examination prosecutrix admitted that she had previously testified in the case on preliminary hearing and had testified at the former trial about one month prior to the within trial. She was asked if at the last hearing she had not been asked, "Now, after you had taken off your panties, and he had raised your dress up, then what happened?" She admitted she had. She

was then asked if she did not remember answering: "He stuck his private parts to mine." She insisted that he stuck his private parts into her. She finally admitted that she might have at the previous trial said that he stuck his private parts "to" hers, but that if she said it, that she did not mean it. She admitted that she had many times discussed with the special prosecutor her testimony at the prior trial. She was asked: "And you discussed where that testimony differed with the testimony that you had given in the preliminary hearing in this case, didn't you?" She answered, "Yes, sir". Witness later, with reference to the special prosecutor said: "He hadn't told me anything to say, he just told me to get up here and tell the truth", whereupon there was a burst of applause from some of the spectators in the court room. Counsel for defendant moved for a mistrial on the theory that partisans who had contributed money to hire a special prosecutor for the second trial were responsible, but questioning of spectators in the absence of the jury failed to sustain that thought. The court properly admonished the spectators after the outburst, and denied a mistrial.

Witness said there was no conversation between her and the defendant after they left the house until he stopped the car and asked her to take off her underclothing, and that nothing was said until he had completed the act and was on the way to the store when "He just said, 'This car sure drives good—smooth', something or other like that, and I said, 'yes' ". She said thereafter he said, "Don't tell Mary or your mother or nobody will like you." She said she could not remember when or where they were when he made the last admonition, but finally said that it was after they drove in his yard on returning from the cafe.

Witness did not remember getting some bread from her home and taking it back over to her sister's home that night. She said that after the incident with Bobby Gene that she only visited her sister's home one time, and that was "When she [Mary] brought me up there to tell Bobby Gene that he hadn't done it."

On further cross-examination Nancy admitted that she had made a trip with her

sister Mary and the defendant to Sapulpa after the alleged incident, and admitted that she was alone with Mary with whom she agreed she had been very close, but that she had not told her about Bobby Gene molesting her. Witness also admitted that she had made a trip with her parents to Arkansas, and after coming back had gone swimming with her sister, and that she had gone with her sister and brother-in-law to the Lake View Amusement Park, in Tulsa, after the alleged rape.

Witness denied that before she ever told her mother that Bobby Gene had molested her that what actually happened was that the mother had noticed the outer infection and her swollen parts and had first suggested to her daughter that someone must have molested her. Counsel then after further cross-examination asked witness: "If you testified before that your mother told you—I am using the word 'told' rather than 'suggested', that your mother told you someone must have molested you, was that statement true or false? A. True. * * * Q. She made the suggestion to you before you had even made any complaint that—before you had even made any complaint to her, isn't that right? A. Yes, sir."

Witness further admitted that some time prior to the time that she stated to her mother that Bobby Gene had molested her (she denied that it was the night prior—she said that she did not know when it was) that she had been at her sister's when her sister and Bobby Gene had a fuss about Mary eating the heart out of a watermelon, and she said that Bobby Gene slapped her sister on the arm and that she got mad at him for that. On direct examination she had stated that she had not liked him since the night she said he molested her, and on cross-examination she had not liked him since she said he slapped her sister.

Ada Dirickson, mother of the prosecutrix, testified in substance that Nancy was eleven years of age, that witness was related to defendant as a mother-in-law, that the defendant, his wife Mary, another daughter, resided in Oologah about a block from where witness lived; that it was the usual thing for Nancy to go to her sister's home for the purpose of acting as a baby sitter and to watch television, and that Nancy was in Mary's home on June 19, 1953.

Witness further testified that Nancy left home the evening of June 19 at about 7:30 to 8:00 o'clock and returned somewhere near 11:00, and that no complaint was made to her at that time by Nancy. But she said that she noticed that Nancy was very nervous. Witness was asked: "Q. What did she do after she came home? A. Well, she sat down there with my mother and I a little while, and then of course we went to bed." Witness said that on awakening some time in the night she observed Nancy sitting up in a chair. She said that the next day her daughter complained of not feeling well, and seemed to have a fever. Nevertheless, she said that Nancy accompanied her on a trip to Arkansas, and that they returned the day after, or on Sunday. That the week following Nancy went with Bobby Gene and Mary to Tulsa. Witness said that Nancy just laid around, did not feel well, and would cry when she went to the bath room, and that on Friday, the week following, she examined Nancy's female organs and found them badly swollen, bruised and lacerated, and that Nancy told her that Bobby Gene had bothered her.

Witness further testified that Nancy was taken to see Dr. Melloy on Saturday, June 27. That she was then returned home and taken back to the hospital and doctor on Monday, and remained there for 17 days. She further testified that she saw Nancy's panties after she removed them on the evening of June 19, 1953, and that they had blood on them.

Upon cross-examination witness testified that she had been examined under oath twice before in the trial of the case, and that she had at neither the preliminary hearing nor at the previous trial testified that she had examined the underclothing worn by Nancy. Witness admitted having engaged a special prosecutor for the within trial, and admitted that she had not in the previous trial or at the preliminary testified that on awakening some time during the night of June 19 she saw Nancy sitting in a chair. Witness denied that in the preliminary she had testified that Nancy had complained for about two weeks before.

she examined her and took her to the doctor. On redirect and recross-examination, witness admitted that she had not testified about Nancy's panties, that she had talked to the sheriff and the county attorney about the case, had given them information regarding the case, and had been examined by the county attorney a month prior to this time, and said that she washed the panties and did not know whether she or Nancy had them at that time.

Dr. R. C. Melloy testified that he first examined the prosecutrix on June 27, 1953 at his office in Claremore; that her parents brought her to his office for an examination, and that his examination revealed that the girl's private parts were badly bruised; that it showed a lacerated vulva and "the perineum [the space between the vagina and rectum] was lacerated and infected, swollen and sore." He said that he did not make an internal examination at that time on account of the swelling and external pain then existing.

Witness further testified that Nancy was again returned on June 30 and remained in his hospital until July 16. He stated also that he did not see her after she was discharged until about the 1st of November, at which time he made an internal examination of the female organs of the prosecuting witness. Counsel for defendant objected to testimony concerning the November examination by reason of the remoteness as to time, but was overruled.

On cross-examination the doctor testified that he did not know what caused her condition at the time of his first examination, and that it could have been caused by any one of three different things, to wit: sexual intercourse, an injury by a blow, or coming in contact with a poisonous weed. He further testified that on his last examination he was only able to insert the small finger into the hymen, which was particularly tight and that it was inserted with some difficulty; that the hymen was not ruptured, that if the prosecuting witness had been raped, that is, if penetration past the hymen had taken place, he would have expected the hymen to have been completely torn and that if she had had sexual intercourse one finger could have been introduced into the vaginal tract with ease, rather than with the difficulty he had in the insertion of his smallest finger. The doctor further stated that if Nancy had performed an act of sexual intercourse with an adult male, that it would be particularly painful for a period of some little time, and that he would expect her to experience great pain.

Dr. Melloy stated that the infectious condition of Nancy's private parts was caused by colibacillus, shown to have been a germ that may have come from bodily excretion through the rectum.

Dr. W. D. Anderson testified that he examined the prosecuting witness on October 28, 1953 and, over the objections of the defendant, interposed on the ground of remoteness from the date of the crime charged, was permitted to testify as to his examination made at that time. Said he:

"There was a tear of the skin about an inch and a quarter below the vagina, and on separating the lips of the vagina, this tear seemed to extend into the vagina and through the hymen rim * * * showed a tear in the bottom of the hymen. * * * It extended inside the vagina down on the perineal body, which is the area between the vagina and the rectum. * * * I think there had been a penetration of the female organ of this young lady."

He said the penetration could have been caused by a male organ.

On cross-examination the doctor testified that from his examination it was indicative to him that prosecutrix had not had sexual intercourse. He was asked: "If she had had intercourse, doctor, you would have been able to have gotten more than one finger in, wouldn't you, doctor? A. I think that's true."

Dr. Roy J. Millender testified that he examined the prosecuting witness on November 2, 1953, and over the strenuous objection of counsel, was permitted to testify as to the examination which was made nearly four months after the date of the alleged act. He testified that he examined the vaginal tract of the prosecutrix and

observed a lineal scar extending from a laceration in the perineum to the hymenal ring. He further stated that he could not insert two fingers into the vaginal tract and that he could only be sure that something had occurred to the little girl's private parts, just what, he was not sure.

This evidence completed the State's case. Counsel for the defendant interposed and argued a demurrer, which was overruled.

Mrs. Bedford Casey testified for the defendant. She said that she lived near Oologah and was at the cafe on the night that the defendant and Nancy Dirickson were there. She testified in substance that she sat beside Nancy, who was drinking a coke and that Nancy "took me outside to the rest room", and that at no time while she was there did Nancy cry, but that she acted normal in all respects, was not afraid or nervous, and made no complaint to her, although they were alone. The defendant DeArmond, she stated, was sitting on the same side of the counter with Nancy and witness. She further testified that she was not related to any of the parties interested in the suit. On cross-examination she could not remember the exact date that she was at the cafe, but knew that it was in June.

Rena Bates testified that she lived in Collinsville and was in the defendant's home during the latter part of June for the purpose of getting a table. That Nancy Dirickson had just returned from a trip to Arkansas. That during this visit she saw Nancy and did not observe anything unusual about her and that she saw Nancy run to her home and back. On cross-examination she said that she was the sister of the defendant's step-mother.

Mary DeArmond, wife of the defendant, testified to her relationship with the parties concerned; that Nancy, her sister, was at her home almost every day; that the defendant, her husband, was employed as a truck driver; that she had asked him to go to his mother's cafe after milk and bread, because the stores were closed, and that she asked her sister, Nancy, if she desired to go along and was answered in the affirmative. The time of the departure from her home was set at nine o'clock. Upon returning home Nancy went to her parents' home a block away and returned with some bread because the cafe was out, and upon her return she ran up the steps of the home of witness; that Nancy was not crying, that there was nothing unusual in her actions; that she appeared to be normal as always, and that witness and her little sister had been close. Witness stated that the prosecuting witness continued to come to her home almost daily; that she was alone with Nancy at Sapulpa while her husband was seeking employment, that Nancy made no complaint to her at that time, that she had never complained to her that the defendant had molested her; that on the trip to Sapulpa Nancy rode a merry-go-round at an amusement park, rode a little wooden horse which she straddled, and that she made no complaint as to pain; that after the trip to Tulsa witness, her mother and Nancy and defendant had gone swimming together.

Witness said that on learning that Nancy had accused her husband of molesting her, she went to her father's home and brought Nancy to her home and during the course of the conversation concerning the alleged assault, she told of the conversation she had with Nancy in which Nancy stated that Bobby Gene DeArmond "did not do nothing" to her.

Witness made a further effort to discuss the matter with Nancy, but her father warned her not to do so, and told her to keep away from Nancy.

On cross-examination witness stated that she observed some stain on a pair of shorts that her husband had worn and that since she had sexual relations with the defendant she thought that she might have caused the stain.

On re-direct examination, witness testified that her parents were unfriendly toward her husband; that the unfriendliness had been discussed by her parents in the presence of the prosecuting witness. She also said that the home of her parents' was not modern, that there was an outdoor toilet; and that Nancy would often void water at night in the weeds and grass near her home.

On re-cross examination witness stated that her father never came to her home. That her mother would come, and that as a result of her squabble with her husband over her eating the heart out of half a watermelon they had brought back from their trip to Sapulpa and Tulsa, that her sister Nancy, who was present, got mad because the defendant pushed witness against the door. Nancy immediately left their home.

The defendant, Bobby Gene DeArmond testified as to his age, kinds of work performed, military service, that he had never been convicted of a felony, testified to his marriage, one child, location of his home and having gone to Lawson's Cafe, accompanied by the prosecuting witness. Defendant admitted having had sexual relations with his wife on that particular evening; that he went to the cafe at his wife's request, denied that he stopped on the way to the cafe or molested the prosecutrix, saw a number of people that he knew at the cafe, and that Nancy had two cokes and a package of pig skins and that she acted normally at all times while in the cafe, drinking her coke and twisting around on the stool.

Witness estimated the time spent at the cafe at around fifty minutes; that upon returning home the prosecutrix took cokes into his home to Mary, his wife; that Nancy then went to her parents' home and returned with bread for his lunch, which was to be prepared by his wife the following day; that he had seen Nancy several times since this particular instance; that the prosecutrix had accompanied him and his wife on two trips to Sapulpa soon thereafter, and had ridden astride a horse on a merry-go-round at an amusement park, and that he and his wife, prosecutrix and her mother had gone swimming a day or so thereafter.

Witness said that after learning that Nancy had accused him of molesting her, she came to his home and refused to answer his questions relative to the molestation and in answer to his wife's question, "Now Nancy, Bobby Gene didn't bother you now, did he?" she answered "No".

"Why did you tell mamma that for? She said, "I don't know.".

On cross-examination witness re-affirmed that he believed it was between the first and ninth of June that he and Nancy went to his mother's cafe, and that they had been swimming several days thereafter, had been to a show or shows, that he did not turn off the highway on the night in question, renamed the people at the cafe, said there were no blood stains on his underwear, denied a conversation with the deputy sheriff with reference thereto, and on re-direct examination stated he had sexual relations with his wife and that it was the next day or so that she started her menstrual period.

Herbert Hart was offered in rebuttal, being a deputy sheriff who said that he arrested the defendant and held a conversation with him with reference to his wife's menstrual period.

At the close of all the evidence it was stipulated and agreed that the witness Ada Dirickson had given the following testimony at the preliminary hearing:

"Q. You say she complained two weeks? A. Yes."

And that the witness Nancy Dirickson was asked these questions and gave the following answers:

"Q. Now, do you remember being questioned in the preliminary hearing about what happened? A. Yes, sir.

"Q. You remember this question being asked you, and you gave this answer: 'Now, after you had taken off your panties, and he had raised your dress up, then what happened?' You remember that question being asked you? A. Yes, sir.

"Q. Is that true, Nancy? A. Yes, sir.

"Q. That is what happened, he stuck his private parts to yours, is that correct, he didn't stick any privates in you at all, did he Nancy, is that right, Nancy? A. Yes.

"Q. I see, he didn't stick his privates in you at all, he stuck them to

you as you testified before, that is right, isn't it? A. Yes."

Court then recessed.

Court reconvened at 1:00 P.M., and the instructions were read to the jury by the trial judge, and arguments by counsel were made, and thereafter the jury was taken to the jury room by the bailiff; but at 4:30 P.M. the jury was returned to the court room and the court read supplemental instruction No. 20 to the jury, and three forms of verdict were given the jury and deliberations were commenced but at 6:15 the jury was returned into the court room and upon inquiry from the court stated that they had been unable to reach a verdict. The court then recessed for the evening meal and at 8:30 P.M. the jury resumed deliberations, but at 10:30 P.M. at the request of the jury it was brought into the court room and the jurors wanted the entire testimony of Ada Dirickson, Mary DeArmond and Bobby Gene DeArmond read to them. This was done.

The jurors then wanted the term "corroborate" clarified. The court verbally further instructed the jury as to the meaning of "corroborate" and "uncorroborated" and the jury was returned to the jury room, but at 12:10 A.M. the jury was returned into the court room and the foreman announced that the jury still could not agree and that the count stood eight to four. Whereupon the court gave a further instruction urging the jurors to further deliberate and see if they could not come to an agreement, and at 1:30 A.M. the jury was returned into the court room and announced that they had reached a verdict finding the defendant guilty and fixing his punishment at confinement in the State Penitentiary for a period of fifteen years.

Following this, notice of appeal was given, and thereafter on December 2, 1953 a supplemental motion for new trial was filed setting out some 13 allegations of error, the thirteenth assignment reading:

"(13) Misconduct on the part of C. E. Mabry, a juror, who failed to disclose, when questioned on examination, as to his knowledge, interest and previous opinion as to the guilt of the defendant and this juror particularly testifying in the negative as to such knowledge or previous opinion, when as a matter of fact prior to his selection as a juror he had expressed his personal opinion as to the guilt of the defendant, had discussed extensively this case with others and purported to know facts based on rumor not admitted in the evidence in this case. That in support of his motion defendant hereto *advises* the affidavit of Florence Nichols marked Exhibit 'A' and made a part hereof, tenders proof by affidavit and by testimony, if permitted by the court, of the allegations contained in this cause as grounds for new trial."

In the affidavit attached to the motion for new trial, Florence Nichols swore as follows:

"Florence Nichols, a resident of Rogers County, of lawful age, being duly sworn deposes and says:

"That my name is Florence Nichols and I am married to Charles Nichols and that together we own and operate the Nichols Ranch located in Rogers County; that the juror C. E. Mabry is my brother-in-law; that subsequent to the first trial of Bobby Gene Dearmond, that trial ending on the 16th day of October, 1953, that thereafter on Monday or Tuesday, either the 19th or 20th of October, I had occasion to have dinner at the Mabry home, his wife being my sister; that during that day the case of the State of Oklahoma vs. Bobby Gene Dearmond became a topic of conversation; that I had attended and heard the trial resulting in a hung jury; that at that time D. E. Mabry, later a juror in the second trial of Bobby Gene Dearmond, told me that he had heard considerable discussion around Talala and Oologah about the defendant Bobby Gene Dearmond and that he understood him to have a bad character and unquestionably to be guilty of this charge; he further stated he understood that when Bobby Gene Dearmond lived in Collinsville, Oklahoma; that the Chief

of Police of Collinsville had to particularly watch Bobby Gene Dearmond to prevent his molesting children; he asserted and expressed his opinion that the defendant was guilty and should have been found guilty; we had further conversation concerning the case in that I told him that I had heard all the evidence in the case that was tried in October and that the evidence did not prove the defendant to be guilty. At the conclusion of our discussion of the case my brother-in-law, C. E. Mabry, still expressed opinion that the defendant was guilty and I still expressed my opinion that he was innocent.

"That at the courthouse at Claremore, Rogers County, Oklahoma, on December 2, 1953, my brother-in-law, C. E. Mabry, was present on the date set for hearing the motion for new trial in this case at which time he stated to me, 'Florence, Janie and I were certainly surprised that you and Charles Nichols made bond for Bobby Gene Dearmond', at which time I answered him, 'Yes, Charles, but I was certainly surprised at you sitting on the jury and already having your mind made up that Bobby Gene Dearmond was guilty, as you told me at the time we had dinner together.'

"In view of the above circumstances I voluntarily make this affidavit in interest of justice.

"Further affiant sayeth not.
"(Sgd) Florence Nichols."

At the hearing on the motion, Florence Nichols testified and was cross-examined and reaffirmed the allegations of the affidavit. The court asked witness: "Let's see, did you know Mr. Mabry was on this jury? A. I didn't know it until I came in the door that night and saw him as he was going out, and I was really surprised that he would sit on a jury after having that talk with him." The court struck this answer as not being responsive. Witness then said that she did not know that her brother-in-law was on the jury panel even, until she walked into the court room the night in question.

The court later asked witness: "Well, what's the relation then with these folks that you would be on the bond? A. Because I feel the boy wasn't guilty after I heard the first trial, and I felt sorry for him, and went on his bond."

Witness admitted that she did not attend the second trial.

C. J. Strange, father of Florence Nichols, testified that he was visiting his daughter, Mrs. Mabry, about October 19 or 20 and had dinner with Mr. Mabry and his daughter, and that his other daughter, Florence Nichols was there also and that he heard the conversation between Mrs. Nichols and Mr. Mabry as related by Mrs. Nichols. This was further corroborated by an affidavit of Molly B. Strange, wife of C. J. Strange, and the mother of Mrs. Nichols and Mrs. Mabry.

C. E. Mabry testified for the State and said the dinner testified to was on the 3rd day of November, rather than in October. He denied expressing an opinion as to the guilt of defendant as retold by his sister-in-law and her parents.

Witness Mabry was corroborated by the testimony of his daughter, Mrs. Mary Lester, who was present at the dinner in question. Also Mrs. C. E. Mabry, sister of Mrs. Florence Nichols, testified that she heard part of the conversation between her sister and husband with reference to the first trial of DeArmond, and that she never heard her husband express an opinion as to defendant's guilt or innocence; that he said, "he couldn't tell if he was guilty or innocent until he had heard the evidence." She said it was after this, and on the 7th day of November when her husband was summoned as a juror.

Mrs. Doris Mabry, daughter-in-law of C. E. Mabry, and who lived in his home, testified and corroborated the testimony of C. E. Mabry.

The court overruled the motion for new trial and pronounced judgment.

▇ The above is the complete picture. And, as stated, the court was correct in giving instruction No. 8, wherein the jury was advised that it could not convict the defendant upon the uncorroborated testi-

mony of the prosecuting witness. The jury was then told that prosecutrix' testimony would have to be corroborated by other evidence.

From the testimony summarized we have noted material discrepancies in the evidence of prosecutrix as given at the preliminary, the first trial, and as finally given in the within trial. We have noted the animosity existing between her parents and the son-in-law, the defendant, and finally, and which was apparently justified, the resentment welling in prosecutrix on observing defendant slap or push her sister by reason of the watermelon incident. A few hours following this the mother of prosecutrix discovered Nancy's infection of the surface of the perineum and vaginal outer parts caused by colibacillus. The mother, as is natural, thought of a sexual experience as the cause of the swelling and apparent laceration of the little girl's privates, and so suggested to her, whereupon Nancy agreed. That is still the big question. And the defendant may by his acts have brought about Nancy's troubles. But such conclusion must be arrived at from the evidence, and not from surmise and prejudice.

The trial court having determined, and this court concurring in the determination, that corroboration, in view of the uniform holdings of this court already recited, was necessary, we must now determine if there was sufficient corroboration to support the verdict and judgment appealed from. ·

██ It is admitted that one night in June, 1953, Nancy, at the suggestion of her sister, defendant's wife, did go in the family car with the defendant from Oologah to his mother's cafe in Talala to get milk for their infant and bread for his lunch. So there was opportunity. And while the opportunity may be considered as one of the circumstances, it is not of itself corroboration, and cannot be considered on the subject of corroboration. Alcorn v. State, 70 Okl.Cr. 386, 106 P.2d 838; People v. Brehm, 218 App.Div. 266, 218 N.Y.S. 469.

Nancy had opportunity when she reached the cafe a few minutes after the alleged act, if it actually happened, to have made complaint to a number of her acquaint-ances, and particularly to Mrs. Casey, whom she accompanied to an outdoor toilet and where she waited outside to watch for her. But she did not act disturbed, and her eyes were not red, there was no visible remorse, and she made no mention of anything having happened to her.. On the contrary, she drank two bottles of pop, ate pigskins and acted as a girl of her age might have been expected to act. She sought no place to bathe her parts as would be expected if the things happened as she said. She did not inform her sister of any irregularity in the conduct of the defendant, when she reached her sister's home. She took soda pop in to her sister, and went to her mother's a block away for bread, having been unable to get any at the cafe. She made no complaint to the mother and grandmother on reaching her own home. There is no contention that she ever screamed out at the time the act was alleged to have been committed, or even protested. And while from the medical evidence recited, it is apparent that there had never been penetration of Nancy's private parts past the hymen (although Nancy at the within trial testified to full penetration) if the defendant sought sexual satisfaction by penetration between her legs and outside the vagina, an emission could have been expected that would have caused Nancy to seek to wipe herself with something and to bathe. Failure would have left a noticeable odor. There is no evidence of anything like that. Minutes later persons whom she was around noticed nothing suspicious. There was no evidence of an outcry or a tear, or a protest of any kind; there was not even any evidence from Nancy that her experience caused her any pain whatever, although the medical evidence was that the sexual experience that she recited would have caused excruciating pain by reason of her youth and virginity. And the wife after she caused her sister to face her husband, and after Nancy denied that defendant had molested her, from there on stood by her husband.

And there is no evidence that anything ever happened to Nancy's sex organs until her mother for the first time noted swelling and soreness and what she thought was

laceration. This was on a Friday, and the next day she took Nancy to Dr. Melloy at Claremore for an examination. This was in the week following the alleged time that Nancy accompanied defendant to the cafe and alleged to have been on Friday, June 19, 1953, though the defendant claimed it was earlier in June.

Dr. R. C. Melloy swore that he saw the prosecutrix for the first time on June 27, 1953 in his office, where her parents had brought her; that complaint was soreness in her privates. He found a bruised and lacerated vulva (external female parts) and perineum (muscular structure that divides the vagina and rectum) swollen and infected. He testified that the prosecutrix returned to his office on June 30 and stayed in the hospital until July 16, 1953, and that he treated the external female parts, the vulva, palliative treatment to relieve the pain and treated the infection. He had no opinion as to what produced the wounds he found. He did not, during this time, by reason of the soreness, examine the internal sexual parts. He did not make an internal examination until the first week in November, 1953, over four months following the alleged rape.

Dr. Melloy found that a tear on the perineum from which the infection apparently commenced, still showed, and this scar extended into the vagina to the edge of the hymen. The doctor could only with difficulty get his little finger into the vagina at this time in spite of the slight tear at the edge, and neither of the three doctors would testify that the girl had been penetrated past the hymen by anything as large as a male organ. It was stated that in childbirth the perineum is sometimes torn. There was no evidence that the muscles of the perineum were stretched or injured. It was only the surface skin that had been scratched and torn and from which an infection developed and spread.

■ The medical examinations over four months after the alleged act were of no aid so far as determining whether or not the condition of the little girl was due to a sex act or some accident, or that the defendant was the author of such condition. Louis v. State, 92 Okl.Cr. 156, 222 P.2d 160. Such examination conclusively showed that the prosecutrix still had her hymen and that she had never been penetrated at least past the hymen. Obviously at such late date or even at Dr. Melloy's first examination over a week after the alleged happening, there could be no examination for the male sperm.

Dr. Melloy was of the opinion that the abrasions and skin ruptures could have been produced (1) by sexual intercourse (outside the hymen), (2) an injury by a blow, or (3) coming in contact with a poisonous weed. The infection was by reason of a germ, colibacillus, as already stated.

That a germ in a small skin abrasion can cause damage and even death has come to the attention of the writer a number of times, and one time personally when a small fester on his little finger of the left hand and about the size of a pin head, was squeezed and mashed with the thumb nail of the right hand, and a few hours thereafter the hand was about twice its normal size and the whole arm about a fourth larger than normal, and a surgeon administered a local anesthetic and cut out the center of the infection and treatment for many days was necessary. That was before the time of penicillin and the miracle drugs.

During the week or more after the opportunity of defendant to have authored Nancy's condition she rode on a merry-go-round, visited in Arkansas with her parents, made two automobile trips with her sister and defendant, and there was opportunity by reason of her activities, to have received the injury that made possible the infection, and by means other than sexual acts. Whether there was opportunity for sexual experience with youth or adult after the night of June 19, 1953 is not disclosed by the record. It is apparent that the only opportunity the defendant had to molest the prosecutrix was not later than the night that she accompanied him to his mother's cafe for milk and bread.

Did the testimony of Ada Dirickson, the mother, corroborate that of Nancy? It would appear that the testimony of the mother caused the conviction of the defendant, because she swore that on the night of June 19, 1953, the night her daughter drove to the cafe with the defendant, that she

discovered blood on her daughter's panties. If the mother had thereupon questioned Nancy and she had accused the defendant and had kept the panties as evidence and had immediately examined her and had taken her to the doctor, we would in a very short opinion have sustained the conviction. But the fact is, that if there was blood on Nancy's panties or underclothing the night of June 19, 1953, it did not cause any apprehension on the part of the mother; she did not quiz Nancy, and in all her conferences with the county attorney or the officers there is no evidence that she ever mentioned this vital piece of evidence to them and she further failed to mention it in testifying at the preliminary hearing, and later on at the first trial failed to mention this point. She testified that she washed the panties, and did not know whether they still had them or not.

If Nancy was nervous on arriving home the night of June 19, 1953, sat up on a chair in the night time, and her panties were found by the mother to be bloody, a sane person would have at once become apprehensive and would have immediately sought to find out the why of what she noticed. But she did nothing. Should the defendant herein be convicted and incarcerated in the penitentiary for 15 years on such inconsistent conduct and testimony on the part of Ada Dirickson? Obviously the jury was worried about this very question and experienced great difficulty in reaching the verdict that they finally did. They sought further explanation from the court of the terms "corroborated" and "uncorroborated". They wanted to know the meaning of such words. They deliberated way into the morning, 1:30 A.M. There had been much feelings and popular subscription to have a special prosecutor at the within trial. There had been applause by spectators. The court had by a special verbal instruction urged the jury to agree upon a verdict. There had been one previous trial. The jury had been brought back into the court room several times that night; no doubt every member was tired; the four hold-out members finally agreed with the eight and all decided that the evidence recited was sufficient corroboration and the penalty of fifteen years imprisonment was assessed.

Our statute, as stated by Judge Furman in Davis v. State, 4 Okl.Cr. 508, 512, 113 P. 220, 222, is mandatory that a defendant is entitled to an acquittal where his guilt is not proven by competent evidence beyond a reasonable doubt. Tit. 22 O.S.1951 § 836. Judge Furman in that case, with reference to the jury, said:

> "It is not necessary that a jury should be reasonably satisfied that a defendant is not guilty before they can acquit him. It is their duty to acquit the defendant when the testimony [of the state] fails to satisfy them beyond a reasonable doubt that he is guilty. If they entertain a reasonable doubt as to the guilt of the defendant, they must acquit him, although each member of the jury may not be reasonably satisfied of his innocence. A verdict of not guilty is not a verdict of innocence, but is a verdict of not proven; and it may often happen that a jury under the law and under the evidence are required to find the defendant not guilty when each member of such jury may not be satisfied of his innocence."

This same principle must not be overlooked by this court where under the exception to the rule it becomes the duty of the court to weigh the evidence in a rape case.

■ We determine as a matter of law, after much study and analysis, and resolving the doubts in favor of the defendant, that there was no sufficient corroborative evidence in the record to show that the defendant was guilty of rape as charged and for which he was convicted. This being so, the case must be, and is, reversed and remanded and the charge is directed to be dismissed.

BRETT, J., concurs.

JONES, Presiding Judge (dissenting).

A close question is presented as to whether the evidence was sufficient to sustain the conviction for rape. By giving the defendant the fullest advantage of every doubt, I could agree that the evidence was insufficient to sustain a conviction for rape in the first degree. However, there is abundant proof to sustain a conviction for the in-

cluded offense of assault with intent to commit rape. The attempt on the part of the defense to show such animosity on the part of the young child that she would fabricate the story which she related was unconvincing to me as it evidently was to the jurors who heard it. Another important factor strongly corroborative is that the wife of the defendant admitted on cross-examination that she told deputy sheriff Hart that she noticed the defendant's underwear was bloodstained the night of the alleged assault and on further examination she repeated that she did notice that they were bloodstained and then she made this observation, "Well, I noticed it, and then I got to thinking it could have been me." But she never intimated to the deputy sheriff at the time she told him of the bloodstained underwear that it might have been she who caused it. She further related that she took the deputy sheriff from her mother's home up to her house and searched for the underwear and could not find it. I am thoroughly convinced the accused was unlawfully molesting this young child. Because there is some doubt as to actual penetration, I would modify the judgment to the included offense of assault with intent to commit rape, assess a reasonable punishment commensurate with the facts and affirm.